Argued and submitted August 31, 1993; reargued and resubmitted November 2, 1994; reassigned November 3, 1994, decision of the Court of Appeals reversed and order of the district court affirmed April 27, 1995

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## BOYD ALAN FISH,
*Petitioner on Review.*

(DC 90-11996; CA A67743; SC S40015)

893 P2d 1023

John Henry Hingson III, Oregon City, argued the cause and filed the petition on behalf of petitioner on review.

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause on behalf of respondent on review.

UNIS, J.

Gillette, J., concurred in part and dissented in part and filed an opinion in which Van Hoomissen and Graber, JJ., joined.

Van Hoomissen, J., concurred in part and dissented in part and filed an opinion.

Graber, J., concurred in part and dissented in part and filed an opinion in which Van Hoomissen, J., joined.

**UNIS, J.**

On May 24, 1990, defendant was driving his Ford Bronco southbound on a public highway in Clackamas County. A deputy sheriff, who was driving in the opposite lane of travel from defendant, observed defendant's vehicle swerve. The deputy turned around and signaled defendant to pull his vehicle to the side of the road. When the deputy approached defendant's vehicle, he smelled alcohol, saw that defendant's eyes were "bloodshot and watery," and noticed a can of beer on the floor of the vehicle next to the driver's seat. Defendant told the deputy that he had consumed "three beers." The deputy asked defendant to step out of his vehicle and perform field sobriety tests. The deputy advised defendant that, if defendant refused to perform the field sobriety tests, his refusal could be used against him as evidence in court. Defendant refused to perform the tests. He was arrested and charged with the crime of driving under the influence of intoxicants (DUII), ORS 813.010.

Before trial, defendant moved to suppress evidence of his refusal to perform the tests. Defendant argued that the deputy did not comply with statutory requirements in advising defendant of the consequences of his refusal. Defendant also argued that the admission of his refusal to perform field sobriety tests violated his rights against self-incrimination under Article I, section 12, of the Oregon Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. The district court granted defendant's motion on both statutory and constitutional grounds.

Pursuant to ORS 138.060(3), the state appealed the district court's order suppressing evidence of refusal. The Court of Appeals reversed the district court's order and remanded the case for further proceedings. The court rejected defendant's argument regarding the adequacy of the deputy's advice of consequences, holding that the deputy's words " 'substantially convey[ed]' the necessary information" required by the statute. *State v. Fish*, 115 Or App 609, 613, 839 P2d 278 (1992) (quoting OAR 257-25-015(2)). The court also held that the admission of evidence of defendant's refusal to perform field sobriety tests did not violate his rights against self-incrimination. *Id.* at 614. We allowed defendant's

petition for review and now reverse the decision of the Court of Appeals and affirm the order of the district court.

Defendant challenges the admission of his refusal to perform the field sobriety tests on a number of grounds, both statutory and constitutional. We shall address defendant's subconstitutional argument before considering his constitutional arguments. *See State v. Stevens*, 319 Or 573, 579, 879 P2d 162 (1994) (applying that methodology).

Defendant contends that the deputy failed to comply with ORS 813.135 and ORS 813.136 and that, therefore, evidence of defendant's refusal to perform field sobriety tests should be suppressed. ORS 813.135[1] requires that, before field sobriety tests are administered to a person whom a police officer reasonably suspects to be under the influence of intoxicants, the person "shall be informed of the consequences of refusing to take or failing to submit to the tests under ORS 813.136." Those consequences are as follows:

> "If a person refuses or fails to submit to field sobriety tests as required by ORS 813.135, evidence of the person's refusal or failure to submit is admissible in any criminal or civil action or proceeding arising out of allegations that the person was driving while under the influence of intoxicants." ORS 813.136.

■■ In this case, the deputy testified that he "advised [defendant] that he had the right to refuse the field sobriety test; that if he did refuse the test, that could be used against him as evidence in court." We conclude that the advice of consequences complied with ORS 813.135 and 813.136.[2]

---

[1] ORS 813.135 provides:

"Any person who operates a vehicle upon premises open to the public or the highways of the state shall be deemed to have given consent to submit to field sobriety tests upon the request of a police officer for the purpose of determining if the person is under the influence of intoxicants if the officer reasonably suspects that the person has committed the offense of driving while under the influence of intoxicants in violation of ORS 813.010 or a municipal ordinance. *Before the tests are administered, the person requested to take the tests shall be informed of the consequences of refusing to take or failing to submit to the tests under ORS 813.136.*" (Emphasis added.)

[2] Actions taken by officials acting under delegated authority must comply with applicable administrative rules as well as statutes. *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984). However, defendant did not raise in the trial court, or make before the Court of Appeals, any argument that the deputy's advice of consequences did not comply with any applicable administra-

ORS 813.135 requires that a suspect be "informed of the consequences of refusing to take or failing to submit to the tests under ORS 813.136." No particular language is required by the statute. In this case, the significant difference between the language of the statute and the warning given to defendant is that the deputy stated that the refusal could be used against defendant "in court," rather than "in any criminal or civil action or proceeding arising out of allegations that the person was driving while under the influence of intoxicants."

To determine whether the deputy's advice of consequences complied with ORS 813.135, we must determine what the legislature intended by requiring police officers to give the advice of consequences. In *State v. Trenary*, 316 Or 172, 850 P2d 356 (1993), this court discussed the legislative purpose of the advice of consequences required by ORS 813.135:

"The main purpose of the [advice of consequences required by] ORS 813.135 was not to create a right, but to bring further pressure on suspected intoxicated drivers to take the field sobriety tests. The statute aimed to advise drivers who may be disposed *not* to perform the tests that, if they refused,

---

tive rules. Nor did the state rely on any administrative rules in arguing that the advice of consequences was adequate. Nevertheless, the Court of Appeals, in holding the officer's advice of consequences to be adequate, relied on an administrative rule promulgated by the Oregon State Police, OAR 257-25-015(2), which provides:

"The information about the consequences [of refusal communicated by the officer pursuant to ORS 813.135] need not be in any particular form or order, but shall substantially convey the following: If a person refuses or fails to submit to field sobriety tests as required by law, evidence of the persons' [sic] refusal or failure to submit is admissible in any criminal or civil action or proceeding arising out of allegations that the person was driving while under the influence of intoxicants."

Defendant now argues to this court that the Court of Appeals' reliance on OAR 257-25-015(2) is misplaced because the rule improperly *lowers* the standards for advice of consequences required by police officers. *See U. of O. Co-Oper. v. Dept. of Rev.*, 273 Or 539, 550, 542 P2d 900 (1975) ("an administrative agency may not, by its rules, amend, alter, enlarge or limit the terms of a legislative enactment"). We reject that argument because we do not read OAR 257-25-015 as requiring an officer to convey *less* information about the consequences of refusal or failure to submit to field sobriety tests than is required by ORS 813.135 and 813.136.

Defendant does not argue that the State Police lack statutory authority to enact OAR 257-25-105(2). *See Planned Parenthood Assn.*, 297 Or at 565 (to determine the validity of administrative action, first inquiry is whether the action was authorized). Nor does defendant argue that the rule requires a *more stringent* warning than the statute. The Court of Appeals did not decide those issues, nor do we.

evidence of the refusal would be admissible, provided that they were warned of the consequences of the refusal." *Id.* at 177 (emphasis in original).

This court further stated that the legislature's reason for enacting ORS 813.135 and 813.136 was "to compel drivers to take field sobriety tests." *Id.* at 177-78. In light of the purpose of the advice of consequences required by ORS 813.135, an officer's advice of consequences complies with ORS 813.135 if it adequately informs the driver of the consequences of refusal so as to bring further pressure on the driver to perform the tests.

In this case, the advice of consequences given was no less effective in bringing pressure upon defendant than if the deputy had used the exact words of the statute. Under the facts of this case, we conclude that the warning given by the deputy sufficiently informed defendant of the consequences of refusal so as to comply with the requirements of ORS 813.135.

We turn now to defendant's constitutional arguments. Defendant argues that the admission of his refusal to perform the field sobriety tests would violate his rights against compelled self-incrimination under the state and federal constitutions. We first consider defendant's assertions under the Oregon Constitution. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (stating methodology).

Article I, section 12, of the Oregon Constitution provides in part:

"No person shall be * * * compelled in any criminal prosecution to testify against himself."

The right against compelled self-incrimination applies "to any kind of judicial or nonjudicial procedure in the course of which the state seeks to compel testimony that may be used against the witness in a criminal prosecution." *State v. Langan*, 301 Or 1, 5, 718 P2d 719 (1986). Thus, to receive protection under the self-incrimination clause of Article I, section 12, a person's statement or conduct must (1) be "testimonial" evidence, (2) be "compelled," and (3) be evidence that could be used against the person in a criminal prosecution.

We therefore must determine whether evidence of defendant's refusal to perform field sobriety tests is "testimonial" evidence under Article I, section 12. For purposes of the right against self-incrimination, "testimonial" evidence is not limited to in-court testimony under oath. Rather, the label "testimonial" is simply shorthand for the type of evidence that is subject to the right against compelled self-incrimination. To understand the scope of the protection provided by the right against compelled self-incrimination, we examine the history and purpose underlying the right.

Article I, section 12, of the Oregon Constitution was based on Article I, section 14, of the Indiana Constitution of 1851. Charles Henry Carey, *The Oregon Constitution* 468 (1926). Those provisions are similar to provisions that appear in the constitutions of 48 states. John William Strong, ed., 1 *McCormick on Evidence* § 115, at 425 (4th ed 1992). Although the wording of the different constitutional provisions varies, the variations commonly are not considered to convey different meanings because the provisions share a common origin. John Henry Wigmore, 8 *Wigmore on Evidence* § 2263, at 378 (McNaughton rev 1961). The right against compelled self-incrimination was firmly established in the American colonies by the mid-eighteenth century. Leonard W. Levy, *Origins of the Fifth Amendment* 368-404 (1968). However, there is some indication that the right was recognized in the colonies as early as 1650. R. Carter Pittman, *The Colonial and Constitutional History of the Privilege Against Self-Incrimination in America,* 21 Va L Rev 763, 775 (1935). In 1776, a self-incrimination clause was incorporated into the Virginia state constitution, and seven other states followed suit shortly thereafter. Levy, *Origins of the Fifth Amendment* at 405-09. The Fifth Amendment to the United States Constitution, drafted in 1789, was based on those provisions of state constitutions. *Id.* at 422.

The right against compelled self-incrimination was imported to the United States as a part of the common law of England. *Id.* at 368. The right developed in England in the mid-seventeenth century. *Id.* at 301-32. The right against compelled self-incrimination had its roots in opposition to the oath *ex officio,* a procedure used by the ecclesiastical courts in England that required the accused, without having been

formally charged or informed of the identity of his or her accusers, to answer questions under oath, the purpose of which was to extract a confession. *Id.* at 47. Opposition to that inquisitorial procedure increased when it was later adopted by the courts of the Star Chamber and of the High Commission, which used the oath to enforce political and religious conformity with views of the crown. Strong, 1 *McCormick on Evidence* § 114, at 422. In 1641, in response to abuses whereby individuals were required to make the state's case for them, the oath *ex officio* was abolished along with the courts of Star Chamber and of High Commission. *Id.* at 423. During the mid-1600s, the right against compelled self-incrimination was recognized at common law as well, in the form of the maxim, *"nemo tenetur prodere seipsum"* ("no man is bound to accuse himself"). Levy, *Origins of the Fifth Amendment* at 313-32.

Although the historical basis of the right against compelled self-incrimination has been subject to varying interpretations, *compare* Wigmore, 8 *Wigmore on Evidence* § 2250, at 291-92 (suggesting that the right developed exclusively as a response to lack of charging in Star Chamber) *with* Strong, 1 *McCormick on Evidence* § 115, at 424 (suggesting that the right was broader), it is clear that the right originated and continued to develop as a protection against inquisitorial methods of investigation and prosecution. This history has been reflected in the recognition that the right against compelled self-incrimination is instrumental in maintaining a fair balance between individual autonomy and the governmental interest in prosecuting alleged offenders. The right plays a significant role in our adversarial system of criminal justice: "[T]he American system of criminal prosecution is accusatorial, not inquisitorial, and [the right against compelled self-incrimination] is its essential mainstay." *Malloy v. Hogan*, 378 US 1, 7, 84 S Ct 1489, 12 L Ed 2d 653 (1964).[3] The right against compelled self-incrimination is one important component of our accusatorial system of criminal justice, which requires that an individual be presumed innocent until proven guilty, that the government has the burden to prove

---

[3] We decide this case solely under the Oregon Constitution. When we cite federal opinions in interpreting a provision of Oregon law, we do so because we find the views there expressed persuasive, not because we consider this court bound to do so by our understanding of federal doctrines.

an individual's guilt beyond a reasonable doubt, and that the state shoulder the entire load in a criminal prosecution:

"Ours is the accusatorial as opposed to the inquisitorial system. Such has been the characteristic of Anglo-American criminal justice since it freed itself from practices borrowed by the Star Chamber from the Continent. * * * Under our system society carries the burden of proving its charges against the accused not out of his own mouth. It must establish its case, not by interrogation of the accused even under judicial safeguards, but by evidence independently secured through skillful investigation. The law will not suffer a prisoner to be made the deluded instrument of his own conviction." *Watts v. Indiana*, 338 US 49, 54, 69 S Ct 1347, 93 L Ed 1801 (1949) (Frankfurter, J.) (citations and internal quotation marks omitted). ·

Under Article I, section 12, of the Oregon Constitution, individuals may not be compelled to disclose their beliefs, knowledge, or state of mind to be used in a criminal prosecution against them. In offering an individual's refusal to perform field sobriety tests into evidence, the state wants the jury to infer from the fact of an individual's refusal that he or she is saying, "I refuse to perform field sobriety tests because I believe I will fail them." Thus, the fact that a person refused or failed to perform field sobriety tests inferentially may communicate the person's belief — that the person refused to perform the tests because he or she believed that the performance of the tests would be incriminating. For an individual to reveal his or her thoughts is necessarily to make a communication, whether by words or actions. Evidence of an individual's refusal therefore communicates his or her state of mind. Facts giving rise to inferences, no less than direct statements, communicating an individual's state of mind is evidence that is subject to the right against compelled self-incrimination. We therefore conclude that evidence of defendant's refusal to perform field sobriety tests is "testimonial" evidence under the self-incrimination clause of Article I, section 12, of the Oregon Constitution.

Concluding that evidence regarding defendant's refusal to perform field sobriety tests is "testimonial" does not end our inquiry, however. Article I, section 12, prohibits the state from *compelling* an individual to provide "testimonial" evidence. *State v. Jancsek*, 302 Or 270, 284-85, 730

P2d 14 (1986). For the purposes of Article I, section 12, compulsion can take many forms. Some obvious examples are where an individual is on the stand, subject to contempt sanctions if he or she refuses to testify, *see In re Jennings et al*, 154 Or 482, 59 P2d 702 (1936) (right against compelled self-incrimination under Article I, section 12, applied in contempt hearing where individual refused to answer questions under oath), or where an individual is required to act by court order, *see Shepard v. Bowe*, 250 Or 288, 293, 442 P2d 238 (1968) (right against self-incrimination applied in context of court-ordered psychiatric examination). Another example of compulsion is custodial interrogation. *See State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990) (right against self-incrimination applied in context of custodial interrogation). In addition, a statute may compel an individual to testify. *See State of Oregon v. Hennessey*, 195 Or 355, 245 P2d 875 (1952) (immunity statute compelled individual to testify in exchange for grant of immunity).[4]

Our compulsion analysis in this case focuses on a statute, namely ORS 813.136. ORS 813.136 provides that, if a person reasonably suspected by a police officer of DUII "refuses or fails to submit" to field sobriety tests, his or her refusal is admissible in a criminal or civil proceeding. Arguably, ORS 813.136 does not explicitly compel an individual's refusal because it gives that person a "choice" — he or she may either perform field sobriety tests or have evidence of his or her refusal admitted in a civil or criminal court proceeding stemming from the allegations of DUII. The right against self-incrimination does not preclude the state from requiring an individual to make certain choices. *See State v. Mende*, 304 Or 18, 21, 741 P2d 496 (1987) (requiring a defendant to be cross-examined regarding matters asserted in a sworn affidavit submitted to the court did not violate Article I, section 12). But the mere fact that the state gives an individual a "choice" does not necessarily mean that the individual is not compelled to testify against himself or herself. For example, an individual cannot be required to take the stand in his or her own criminal prosecution because to do so would place the

---

[4] The foregoing examples of testimonial compulsion are not intended to be exhaustive, but rather are intended to be illustrative of the diversity of situations in which issues regarding Article I, section 12, may arise.

individual in a "cruel trilemma." The individual in such a situation has three "choices": (1) to testify truthfully (risking self-incrimination), (2) to testify falsely (risking perjury), or (3) to refuse to testify (risking contempt). Although the individual ostensibly has a "choice" among any of those options, it is a Hobson's choice because the individual is required to "choose" either to risk subjecting himself to punishment (perjury or contempt) or to engage in conduct that the state has no right to compel (produce incriminating testimony).

■ Thus, when an individual is given a "choice" between various courses of conduct, the determination of whether the "choice" constitutes compulsion depends on the nature of the options. Where every "choice" is a course of conduct that the state could not compel an individual to take, mandating by law that an individual make a "choice" among them constitutes compulsion under Article I, section 12.

■ As noted, ORS 813.136 provides defendant a "choice" between two courses of conduct: (1) to perform field sobriety tests or (2) to have evidence of his refusal to perform the tests be admitted against him. One choice — admission of "testimonial" evidence of defendant's refusal — is a course of conduct that the state cannot compel. To determine whether that choice is compelled in violation of Article I, section 12, we must therefore consider the nature of defendant's other option (*i.e.*, performance of field sobriety tests).

In performing field sobriety tests,[5] an individual is required to perform various physical and mental tasks that are designed to elicit responses that demonstrate whether the individual is under the influence of intoxicants. *See* ORS 801.272 (field sobriety test is "a physical or mental test * * * that enables a police officer or trier of fact to screen for or detect probable impairment from intoxicating liquor, a controlled substance or a combination of intoxicating liquor and a controlled substance"). OAR 257-25-020(1) specifies nine tests approved by the Oregon State Police and the Board on Public Safety Standards and Training as "field sobriety

---

[5] The field sobriety tests are described in OAR 257-25-020(1). The tests include the horizontal gaze nystagmus (HGN) test, the walk-and-turn test, the one-leg stand, the Romberg balance test, the modified finger-to-nose test, the finger count, the alphabet, counting, and the internal clock. *Id.*

tests." Under OAR 257-25-020(2), an officer may request that an individual perform some, all, or none of the tests. Defendant in this case did not perform any of the field sobriety tests. The state has not tried to differentiate between "testimonial" aspects and "non-testimonial" aspects of the tests. As proponent of the evidence of defendant's refusal, the state has the burden, after appropriate objection has been raised, of establishing the admissibility of the evidence. *See State v. Carlson*, 311 Or 201, 208, 808 P2d 1002 (1991) (stating principle). When a police officer does not specify to an individual at the time the request is made which tests the individual will be required to perform, we must assume that a generic request to perform "field sobriety tests" constitutes a request that the individual perform all of the tests approved in OAR 257-25-020(1). Thus, for purposes of our analysis in this case, if *any* aspect of the field sobriety tests involves "testimonial" evidence, then the request that defendant perform the tests involves a request for testimonial evidence. *See State v. Hickman*, 273 Or 358, 540 P2d 1406 (1975) (issue not argued to trial court by losing party may not later be used as a basis for overturning decision of trial court). *See also* Strong, 1 *McCormick on Evidence* § 52, at 205-07 (discussing principle). For the following reasons, we conclude that evidence of an individual's performance of at least some aspects of the field sobriety tests is classic "testimonial" evidence that cannot be compelled under Article I, section 12.

Under Article I, section 12, "testimonial" evidence is not limited to verbal statements of fact or belief. Rather, as explained above in connection with evidence of refusal, "testimonial" evidence includes any evidence of conduct communicating the individual's state of mind.[6]

---

[6] Whether field sobriety tests are testimonial presents a difficult issue concerning the boundary between "testimonial" and "non-testimonial" evidence. *See, e.g.,* Charles Gardner Geyh, *The Testimonial Component of the Right Against Self-Incrimination*, 36 Cath U L Rev 611 (1987) (discussing issue); Note, *Self-Incrimination Issues in the Context of Videotaping Drunk Drivers: Focusing on the Fifth Amendment*, 10 Harv J L & Pub Pol'y 631 (1987) (same); B. Michael Dann, *The Fifth Amendment Privilege Against Self-Incrimination: Extorting Physical Evidence from a Suspect*, 43 S Cal L Rev 597 (1970) (same). Because we need only decide if *any* portion of the field sobriety tests approved in OAR 257-25-020(1) involves "testimonial" evidence, we need not delineate the precise contours of "testimonial" evidence under Article I, section 12. Accordingly, we express no opinion regarding whether aspects of the field sobriety tests other than those we expressly address are "testimonial" or "non-testimonial."

 Some of the field sobriety tests involve verbal statements that communicate information regarding an individual's state of mind. Many of the field sobriety tests authorized by OAR 257-25-020(1) draw upon the individual's memory, perception, and ability to communicate, *i.e.*, his or her testimonial capacity. For example, the tests involve counting, OAR 257-25-020(1)(b), (1)(f), (1)(h); answering questions relating to the individual's residence and date of birth, OAR 257-25-020(1)(d)(B); estimating a period of time, OAR 257-25-020(1)(i); and reciting the alphabet, OAR 257-25-020(1)(g). There can be no doubt that those aspects of the field sobriety tests require the individual to communicate information to the police about the individual's beliefs, knowledge, or state of mind. Accordingly, we conclude that at least those aspects of the field sobriety tests are clearly "testimonial" under Article I, section 12, of the Oregon Constitution.

Because a refusal to perform field sobriety tests and the performance of such tests are both "testimonial," defendant was compelled to testify against himself. ORS 813.136 required defendant to choose between two options, neither of which the state could compel defendant to take. The "choice" embodied in ORS 813.136 is even more illusory than the "choice" embodied in the paradigmatic "cruel trilemma." ORS 813.136 created a "cruel dilemma" for this defendant. He could choose (1) to testify against himself by performing the field sobriety tests, or (2) to testify against himself by refusing to perform the tests.[7] In other words, defendant was not given a choice as to *whether* he would incriminate himself, but only as to *how* he would incriminate himself. Because the state cannot compel defendant to provide either form of testimony, such a "choice" constituted compulsion under Article I, section 12, of the Oregon Constitution.

 The statutory scheme of ORS 813.135 and 813.136 effectively eliminated defendant's ability to invoke his right against compelled self-incrimination. Under that scheme,

_____

[7] It might be argued that defendant had a third choice — to walk away from the scene. ORS 813.136 allows admission of both refusal and "fail[ure] to submit." Thus, if a defendant were to walk away from the scene, it would be treated as a refusal. Moreover, even if walking away were an option, doing so could subject defendant to possible criminal liability. *See, e.g.*, ORS 811.540 (class A misdemeanor to flee or attempt to elude police).

defendant had no "choice" by which he could exercise his right against self-incrimination without that exercise being admitted as substantive evidence of guilt. For example, in response to a police officer's request to perform field sobriety tests, if defendant were to say, "I am exercising my right to remain silent under Article I, section 12, of the Oregon Constitution," that response would be treated as a refusal to perform the tests, and the refusal would be admissible as substantive evidence of guilt under ORS 813.135 and ORS 813.136. It is fundamental that the assertion of the right against self-incrimination cannot be considered as evidence of guilt. *See State v. Wederski*, 230 Or 57, 62, 368 P2d 393 (1962) (if the state may refer to a defendant's exercise of the right against self-incrimination with impunity, the right is "meaningless"). By creating a scheme whereby defendant could not invoke his right against compelled self-incrimination, the automatic admission of defendant's refusal to perform field sobriety tests under ORS 813.135 and 813.136 would violate Article I, section 12, of the Oregon Constitution.

Justice Graber's dissent cites *South Dakota v. Neville*, 459 US 553, 103 S Ct 916, 74 L Ed 2d 748 (1983), for the proposition that "[t]o require the making of a choice between two courses of action is not the same as to compel either of the two courses of action." 321 Or at 87. The dissent's reliance on *Neville* is misplaced.

In *Neville*, the issue was whether the defendant's refusal to submit to a blood-alcohol test that the police sought to administer after the defendant was arrested and given *Miranda* warnings was admissible under the self-incrimination clause of the Fifth Amendment. The United States Supreme Court held that the evidence did not violate the Fifth Amendment because the defendant's refusal was not "compelled." The Court's reasoning was premised on the fact that "the State could legitimately compel the suspect, against his will, to accede to the test." 459 US at 563. The Court stated:

> "Given, then, that the offer of taking a blood-alcohol test is clearly legitimate, the action becomes no *less* legitimate when the State offers a second option of refusing the test, with the attendant penalties for making that choice. Nor is this a case where the State has subtly coerced [the defendant]

into choosing the option it had no right to compel, rather than offering a true choice.

"* * * We hold, therefore, that a refusal to take a blood-alcohol test, after a police officer has lawfully requested it, is not an act coerced by the officer, and thus is not protected by the privilege against self-incrimination." *Id.* at 563-64.

*Neville* involved evidence of the defendant's refusal to submit to a search, to which the police *could lawfully compel* the defendant to submit, as a search incident to a lawful arrest. The defendant in *Neville* did not challenge the state's ability to compel him to take the test. Thus, the defendant's choice was between submitting to a test that he had no right to refuse or suffering the consequences of refusal.

Although this case, like *Neville*, involves a refusal to submit to a search, *see State v. Nagel*, 320 Or 24, 31, 880 P2d 451 (1994) (administration of field sobriety tests constitutes a search), *Neville* is inapposite because of the "testimonial" nature of the search involved here. Unlike the "non-testimonial" blood-alcohol test in *Neville*, the type of evidence involved in defendant's "choice" in this case as to both the performance of the field sobriety tests *and* the refusal is "testimonial." Defendant is given a choice only between two ways of incriminating himself. The state has no legal right to compel either choice — *i.e.*, the state has no right to compel defendant to testify against himself. Even the Supreme Court in *Neville* recognized that a choice between such "prohibited choices," 459 US at 563, constitutes compulsion:

"Here, the State did not directly compel respondent to refuse the test, for it gave him a choice of submitting to the test or refusing. Of course, the fact that the government gives a defendant or suspect a 'choice' does not always resolve the compulsion inquiry. The classic Fifth Amendment violation—telling a defendant at trial to testify—does not, under an extreme view, compel the defendant to incriminate himself. He could submit to self-accusation, or testify falsely (risking perjury) or decline to testify (risking contempt). But the Court has long recognized that the Fifth Amendment prevents the State from forcing the choice of this 'cruel trilemma' on the defendant. Similarly, [*Schmerber v. California*, 384 US 757, 86 S Ct 1826, 16 L Ed 2d 908 (1966),] cautioned that the Fifth Amendment may bar the use of

testimony obtained when the proffered alternative was so painful, dangerous, or severe, or so violative of religious beliefs, that almost inevitably a person would prefer 'confession.' " *Neville*, 459 US at 562-63 (citations omitted).

*See also id.* at 563 ("[n]or is this a case where the state has subtly coerced [the defendant] into choosing the option it had no right to compel, rather than offering a true choice"). Thus, even considering *Neville*,[8] requiring the individual to choose from two options, both of which produce self-incriminating "testimonial" evidence, amounts to "compulsion."

In sum, ORS 813.136 gives defendant a "choice" between performing field sobriety tests or having his refusal admitted against him. However, both available choices are self-accusatory, *i.e.*, they require defendant to incriminate himself. Requiring an individual to choose between two options, neither of which the state could compel the defendant to take, constitutes compulsion under Article I, section 12.[9]

The evidence of defendant's refusal to perform field sobriety tests in this case is compelled "testimonial" evidence. The self-incrimination clause of Article I, section 12, precludes such evidence from being admitted against defendant in this criminal proceeding.[10] The district court properly excluded the evidence on that basis.

The decision of the Court of Appeals is reversed. The order of the district court is affirmed.

---

[8] As noted, the facts in *South Dakota v. Neville*, 459 US 553, 103 S Ct 916, 74 L Ed 2d 748 (1983), differ in a material way from the facts of this case. We express no opinion regarding what this court's analysis under the Oregon Constitution would be if a case were to arise with facts analogous to *Neville*. For an analysis of the United States Supreme Court's decision in *Neville*, see H. Richard Uviller, *Self-Incrimination by Inference: Constitutional Restrictions on the Evidentiary Use of a Suspect's Refusal to Submit to a Search*, 81 J Crim L & Criminology 37 (1990).

[9] Indeed, at oral argument, the state conceded that, if the refusal to perform field sobriety tests and the performance of field sobriety tests are both "testimonial," then the statutory "choice" between them constitutes compulsion under Article I, section 12, of the Oregon Constitution.

[10] Because we conclude that the admission of defendant's refusal to perform the field sobriety tests violates Article I, section 12, of the Oregon Constitution, we need not address defendant's arguments regarding the Fifth and Fourteenth Amendments to the United States Constitution. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (stating methodology).

**GILLETTE, J.,** concurring in part and dissenting in part.

We are called upon once again in this criminal case to assess the scope of the protection provided by Article I, section 12, of the Oregon Constitution. Regrettably, the majority misunderstands the question presented and therefore gives the wrong answer. I therefore feel required to dissent.

Let me first note where I agree with the majority:

(1) The advice given by the officer in this case was adequate to apprise the suspect of the consequence of the suspect's refusal to take the field sobriety tests. The majority's analysis on this subject is complete and correct.

(2) The statutory and regulatory scheme under scrutiny in this case is one that attempts to force a suspect to follow a course of action by giving that suspect a range of choices, with the expectation that the suspect will find the legislatively-preferred choice (in this case, the taking of field sobriety tests) the least onerous alternative. The general parameters of the pertinent inquiry in such a case under Article I, section 12, of the Oregon Constitution, are as described by the majority: The legislature may not require the making of a choice if each of the proffered "choices" is one that the legislature could not, standing by itself, constitutionally require.

(3) Finally, the peculiar procedural posture of this case permits the majority to decide the case on a relatively narrow ground, *viz.*, whether *any* of the field sobriety tests is "testimonial." My agreement with this last proposition, however, does not mean that I agree that any one of the field sobriety tests is, in fact, testimonial, or that I agree that, even if one or more tests were testimonial, it would be appropriate in this case to avoid considering whether each of the other tests also is testimonial.[1]

---

[1] I note especially the disservice performed by footnote 6 in the majority opinion, 321 Or at 59 n 6. The last sentence of that opinion states: "[W]e express no opinion regarding whether aspects of the field sobriety tests other than those we expressly address are 'testimonial' or 'non-testimonial.' " As will be demonstrated below, that last sentence needlessly casts doubt on the continued validity of the use of purely physical field sobriety tests and places the entire process of prosecuting

The foregoing areas of agreement having been noted, I turn to the merits of case.

I begin with a note in passing. The majority attempts to show, as it must, that the taking of field sobriety tests is "compelled," for constitutional purposes, by the statutory and regulatory scheme. I need not address that question because, as the majority recognizes, it also must show that the tests, even if "compelled," also are "testimonial."

When an individual is given a "choice" among various courses of conduct, the determination whether imposing a requirement that the individual make that "choice" constitutes compulsion *depends on the nature of the options*. The constitutional rule is straightforward: Where every choice is a course of conduct that the state could not compel an individual to take, mandating by law that an individual make a "choice" among them constitutes compulsion under Article I, section 12. The question presented by this case thus narrows itself to this: Is each and every one of the choices encompassed by the options presented to defendants in ORS 813.136 a choice that the state cannot compel an individual to take? The majority, without any real analysis of the individual tests and, more particularly, of the verbal element in some of those tests, simply waves a wand over them and answers, "Yes." The majority notwithstanding, the correct answer to that question clearly is: "No."

ORS 813.136 provides defendant a choice between two courses of conduct: (1) to submit to the field sobriety tests or (2) to have evidence of his refusal to submit be admitted against him. Taking the majority's point that a refusal to submit to field sobriety tests constitutes "testimonial" evidence, which the state cannot compel, in order to determine whether the use of evidence of defendant's refusal would violate Article I, section 12, the court still must determine whether the nature of defendant's other option, *viz.*, performance of field sobriety tests, is similarly a course of conduct

---

driving under the influence cases under a cloud. As I believe my opinion elsewhere makes indisputably clear, *some forms* of physically testing a DUII suspect are absolutely permissible under Article I, section 12, of the Oregon Constitution, and its federal counterpart. There is no justification at all for the mischief that the majority does in this regard.

that the state cannot compel. If it is, defendant would be entitled to prevail but, unless it is, he is not so entitled.

In performing field sobriety tests,[2] an individual is required to perform various physical and mental tasks that are designed to elicit responses that demonstrate whether the individual is under the influence of intoxicants. *See* ORS 801.272 (field sobriety test is "a physical or mental test * * * that enables a police officer or trier of fact to screen for or detect probable impairment from intoxicating liquor, a controlled substance or a combination of intoxicating liquor and a controlled substance"). OAR 257-25-020 specifies nine tests approved by the Oregon State Police and the Board on Public Safety Standards and Training as "field sobriety tests." The majority, with no real explanation, announces that certain of those tests are testimonial and then, having declared victory, quits the field. The majority is, in my view, wrong.

Under Article I, section 12, "testimonial" evidence is not limited to verbal statements of fact or belief. Rather, "testimonial" evidence includes any evidence of conduct that significantly communicates the defendant's state of mind.[3]

The law recognizes an essential difference between certain types of evidence that it deems to be nontestimonial and other types of evidence that either are or may be testimonial. The class of evidence of the first type includes evidence that commonly is referred to as "physical" evidence.

Both state and federal cases have recognized that *physical* evidence of condition or identity is not testimonial.

---

[2] The field sobriety tests are described in OAR 257-25-020(1). The tests include: the horizontal gaze nystagmus (HGN) test; the walk-and-turn test; the one-leg stand; the Romberg balance test; the modified finger-to-nose test; the finger count; the alphabet; counting; and the internal clock. *Id.* They are discussed at greater length later in this opinion.

[3] As the majority notes, the question whether field sobriety tests are testimonial presents an interesting issue concerning the boundary between "testimonial" and "non-testimonial" evidence. *See, e.g.,* Charles Gardner Geyh, *The Testimonial Component of the Right Against Self-Incrimination*, 36 Catholic U L Rev 611 (1987) (discussing issue); Note, *Self-Incrimination Issues in the Context of Videotaping Drunk Drivers: Focusing on the Fifth Amendment*, 10 Harv J L & Pub Policy 631 (1987) (same); B. Michael Dann, *The Fifth Amendment Privilege Against Self-Incrimination: Extorting Physical Evidence from a Suspect*, 43 S Cal L Rev 597 (1970) (same). The question is not, however, nearly as difficult as the majority then proceeds to make it.

Fingerprints, line-ups, handwriting and voice exemplars, blood samples, and even compelled in-court behavior by an accused tending to increase the likelihood of identification by a key witness, are all nontestimonial in nature. The current test, in the federal context, is stated in *Pennsylvania v. Muniz*, 496 US 582, 588-95, 110 S Ct 2638, 110 L Ed 2d 528 (1990), a case involving the issue whether there were testimonial aspects to a particular Pennsylvania field sobriety test. The Supreme Court of the United States there set forth the relevant analysis, which I understand to be equally apt under Article I, section 12, of the Oregon Constitution:

> "The Self-Incrimination Clause of the Fifth Amendment provides that no 'person * * * shall be compelled in any criminal case to be a witness against himself.' Although the text does not delineate the ways in which a person might be made 'witness against himself,' *cf. Schmerber v. California*, 384 US 757, 761-762, n 6[, 16 L Ed 2d 908, 86 S Ct 1826] (1966), we have long held that the privilege does not protect a suspect from being compelled by the State to produce 'real or physical evidence.' *Id.*, at 764[, 16 L Ed 2d 908, 86 S Ct 1826]. Rather, the privilege 'protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature.' *Id.*, at 761[, 16 L Ed 2d 908, 86 S Ct 1826]. '[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a "witness" against himself.' *Doe v. United States*, 487 US 201, 210[, 101 L Ed 2d 184, 108 S Ct 2341] (1988)."

(Footnote omitted.) The Court drew clear lines between the introduction of testimonial evidence against the accused, and the introduction of physical evidence. It held:

> "We agree with the Commonwealth's contention that Muniz's answers are not rendered inadmissible by *Miranda* merely because the slurred nature of his speech was incriminating. The physical inability to articulate words in a clear manner due to 'the lack of muscular coordination of his tongue and mouth,' * * * is not itself a testimonial component of Muniz's responses to [the officer's] introductory questions. In *Schmerber v. California, supra*, we drew a distinction between 'testimonial' and 'real or physical evidence' for purposes of the privilege against self-incrimination. We noted that in *Holt v. United States*, 218 US 245, 252-253[, 54 L Ed 1021, 31 S Ct 2] (1910), Justice Holmes

> had written for the Court that ' "[t]he prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material" ' 384 US at 763[, 16 L Ed 908, 86 S Ct 1826]. We also acknowledged that 'both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture.' *Id.*, at 764[, 16 L Ed 2d 908, 86 S Ct 1826]. Embracing this view of the privilege's contours, we held that 'the privilege is a bar against compelling "communications" or "testimony," but that compulsion which makes a suspect or accused the source of "real or physical evidence" does not violate it.' *Ibid.*"

*Id.* at 590-91. The Court then cited instances in which it had applied that analysis to allow the admission of blood samples, *Schmerber*, 384 US at 765, testimony derived from a compelled "lineup" and a compelled vocalization of a phrase provided by the police, *United States v. Wade*, 388 US 218, 87 S Ct 1926, 18 L Ed 2d 1149 (1967), a compelled handwriting exemplar, *Gilbert v. California*, 388 US 263, 87 S Ct 1951, 18 L Ed 2d 1178 (1967), and a compelled reading of a transcript in order to provide a voice exemplar, *United States v. Dionisio*, 410 US 1, 7, 93 S Ct 764, 35 L Ed 2d 67 (1973) ("voice recordings were to be used solely to measure the physical properties of the witnesses' voices, not for the testimonial or communicative content of what was to be said").

To be sure, the *Muniz* Court concluded that the challenged question in the Pennsylvania field sobriety test — "Do you know what the date was of your sixth birthday?", to which the defendant responded, "No I don't" — elicited a testimonial communication of "an express or implied assertion of fact or belief," which placed the suspect in the " 'trilemma' of truth, falsity, or silence." *Muniz*, 496 US at 597. The Court ruled that any response to such a question, "(whether based on truth or falsity) contains a testimonial component." *Ibid.* But it is clear that the holding in that case was narrowly limited to the testimonial nature of the particular test; the Court fully endorsed the continued vitality of the

concept that physical evidence, evidence that revealed something about a suspect's physical condition, was not "testimonial."

Oregon decisions that have interpreted Article I, section 12, of our own constitution, have recognized and adhered to the same distinction. One of this court's earliest decisions to rely on that provision noted:

"The constitutions of all the states of the Union, with the exception of New Jersey and Iowa, contain provisions against self-incrimination. There is a variation of wording in these constitutional clauses. The protection is from 'testifying', from 'furnishing evidence', or from 'being a witness'. This difference in phrasing has not been considered important. What the framers of the various constitutions sought to accomplish was to place 'beyond the reach of ordinary legislative alteration' the privilege against self-crimination 'as already * * * in the common law.' "

*State v. Cram*, 176 Or 577, 579-80, 160 P2d 283 (1945) (citations omitted). The *Cram* court then proceeded to cite state and federal cases from other jurisdictions to interpret Article I, section 12. The court held:

"The accused, upon his arrest, may be required to do many things without having his constitutional rights against self-crimination invaded. For the purpose of identification he may be required to stand up in court; to appear at the scene of the crime; to put on a blouse to see if it fits him; to place a handkerchief over his face; to stand up and remove his glasses; to remove his coat and shirt and permit the jury to see scars on his body and to don a shirt introduced in evidence; or to exhibit his arm so as to reveal tattoo marks thereon, which a previous witness has sworn were there. He may also be fingerprinted, photographed and measured under the Bertillon system."

*Cram*, 176 Or at 582-83 (citations omitted). Most pertinent to our present inquiry, the *Cram* court concluded that medical testimony as to the blood alcohol content of the defendant's blood was not testimonial, but physical. *Id.* 176 Or at 593.

Other Oregon court interpretations of the privilege have not materially deviated from the foregoing principle. *See, e.g., State v. Black*, 150 Or 269, 289, 42 P2d 171, 44 P2d 162 (1935) (requiring a defendant to exhibit his body is not

testimony about his body, but his body itself); *State v. Carcerano*, 238 Or 208, 215, 390 P2d 923 (1964), *cert den* 380 US 923 (1965) (compelling defendant to arise); *State v. Fisher*, 242 Or 419, 410 P2d 216 (1966) (handwriting exemplar could be taken without informing defendant of right to counsel); *State v. Tracy*, 246 Or 349, 361, 425 P2d 171 (1967) (taking defendant's trousers at arrest not testimonial); *State v. Hughes*, 252 Or 354, 449 P2d 445 (1969) (handwriting not testimonial); *State v. Nagel*, 320 Or 24, 880 P2d 451 (1994) (no expectation of privacy in voice exemplar). *See also, State v. Miller*, 2 Or App 353, 467 P2d 683, *rev den* (1970) (voice identification); *State v. Brotherton*, 2 Or App 157, 159-60, 465 P2d 749 (1970) (production of physical evidence not testimonial); *Kessler v. Cupp*, 11 Or App 392, 502 P2d 281 (1972) (donning a stocking cap not testimonial, citing federal cases); *State v. Gardner*, 52 Or App 663, 669, 629 P2d 412 (1981) (breath test nontestimonial) (citing *Schmerber*, 384 US at 761); *State v. Anderson*, 53 Or App 246, 248-50, 631 P2d 822 (1981) (refusal to submit to breath test admissible under Article I, section 12, of Oregon Constitution).

From the foregoing cases, I derive the following statement of Oregon constitutional law: Compelling a person to produce physical evidence concerning the person's identity, appearance, or physical condition, and the subsequent use of that evidence against that person in a criminal proceeding, does not violate the defendant's rights under Article I, section 12, of the Oregon Constitution, because such physical evidence is not "testimonial." It follows that a legislative scheme that presents a person with a choice of courses of action, one of which involves surrendering physical evidence of the kind discussed, does not violate Article I, section 12, because one of the alternatives that the person may choose is not a constitutionally impermissible one. That rule is in accordance with the great weight of authority from around the nation.[4] It is frustrating not to have the majority even

---

[4] Cases so holding include *South Dakota v. Neville*, 459 US 553, 103 S Ct 916, 74 L Ed 2d 748 (1983), *Newhouse v. Misterly*, 415 F2d 514, *cert den* 397 US 966, 90 S Ct 1001, 25 L Ed 2d 258 (9th Cir 1969); *Welch v. District Court of Vermont Unit, etc.*, 594 F2d 903 (2d Cir 1979); *Hill v. State*, 366 So 2d 318 (Ala 1979); *Campbell v. Superior Court*, 106 Ariz 542, 479 P2d 685 (1971); *People v. Sudduth*, 65 Cal 2d 543, 55 Cal Rptr 393, 421 P2d 401, *cert den* 389 US 850, 88 S Ct 43, 19 L Ed 2d 119 *reh den* 389 US 996, 88 S Ct 460, 19 L Ed 2d 506 (1966); *People v. Conterno*, 170 Cal App 2d Supp 817, 339 P2d 968 (1959); *People v. Dawson*, 184 Cal App 2d Supp 881, 7 Cal Rptr 384

acknowledge, much less analyze the pertinence of, the "physical evidence" rule.

I turn to a determination whether any of the field sobriety tests described in OAR 257-25-020(1) is "testimonial." For the purposes of that inquiry, I shall discuss each of the tests separately and briefly.[5]

---

(1960); *Finley v. Orr*, 262 Cap App 2d 656, 60 Cal Rptr 137 (1968); *People v. Walker*, 266 Cal App 2d 562, 72 Cal Rptr 224 (1968); *People v. Municipal Court (Gonzales)*, 137 Cal App 3d 114, 186 Cal Rptr 716 (1982); *State v. Durrant*, 5 Storey 510, 55 Del 510, 188 A2d 526 (1963); *State v. Bock*, 80 Idaho 296, 328 P2d 1065 (1958); *People v. Miller*, 75 Ill App 3d 775, 31 Ill Dec 581, 394 NE2d 783 (1979); *Alldredge v. State*, 239 Ind 256, 156 NE2d 888 (1959); *State v. Benson*, 230 Iowa 1168, 300 NW 275 (1941); *State v. Holt*, 261 Iowa 1089, 156 NW2d 884 (1968); *State v. Tiernan*, 206 NW2d 898 (Iowa 1973); *State v. Young*, 232 NW2d 535 (Iowa 1975); *State v. Vietor*, 261 NW2d 828 (Iowa 1978); *State v. Kaufman*, 211 La 517, 30 So 2d 337 (1947); *State v. Dugas*, 252 La 345, 211 So 2d 285 (1968), *cert den* 393 US 1048, 89 S Ct 679, 21 L Ed 2d 691 (1969); *State v. Smith*, 359 So 2d 157 (La 1978); *State v. Willis*, 332 NW2d 180 (Minn 1983); *State v. Meints*, 189 Neb 264, 202 NW2d 202 (1972); *People v. Thomas*, 46 NY2d 100, 412 NYS2d 845, 385 NE2d 584 (1978), *app dism* 444 US 891, 100 S Ct 197, 62 L Ed 2d 127 (1979); *People v. Haitz*, 65 App Div 2d 172, 411 NYS2d 57 (1978); *People v. Smith*, 79 Misc 2d 172, 359 NYS2d 446 (1974); *People v. Mosher*, 93 Misc 2d 179, 402 NYS2d 735 (1978); *State v. Flannery*, 31 NC App 617, 230 SE2d 603 (1976); *Westerville v. Cunningham*, 15 Ohio St 2d 121, 44 Ohio Ops 2d 119, 239 NE2d 40 (1968); *State v. Stanton*, 15 Ohio St 2d 215, 44 Ohio Ops 2d 191, 239 NE2d 92 (1968); *State v. Gatton*, 60 Ohio App 192, 14 Ohio Ops 20, 20 NE2d 265 (1938); *State v. Nutt*, 78 Ohio App 336, 34 Ohio Ops 47, 46 Ohio L Abs 223, 65 NE2d 675 (1946); *Columbus v. Waters*, 69 Ohio L Abs 261, 124 NE2d 841 (1954); *Commonwealth v. Robinson*, 229 Pa Super 131, 324 A2d 441 (1974); *Commonwealth v. Rutan*, 229 Pa Super 400, 323 A2d 730 (1974); *Commonwealth v. Jones*, 242 Pa Super 471, 364 A2d 368 (1976); *Com. v. Dougherty*, 259 Pa Super 88, 393 A2d 730 (1978); *The State v. Smith*, 230 SC 164, 94 SE2d 886 (1956); *State v. Miller*, 257 SC 213, 185 SE2d 359 (1971); *State v. Brean*, 136 Vt 147, 385 A2d 1085 (1978); *State v. Welch*, 136 Vt 442, 394 A2d 1115 (1978); *State v. Wall*, 137 Vt 482, 408 A2d 632, *cert den and app dism* 444 US 1060, 100 S Ct 993, 62 L Ed 2d 738 (1979); *Gardner v. Commonwealth*, 195 Va 945, 81 SE2d 614 (1954); *Barron v. Covey*, 271 Wis 10, 72 NW2d 387 (1955); *Waukesha v. Godfrey*, 41 Wis 2d 401, 164 NW2d 314 (1969); *State v. Albright*, 98 Wis 2d 663, 298 NW2d 196, 26 ALR4th 1100 (1980).

[5] Although the majority technically may choose, as it has, to decide this case solely by identifying certain tests that it believes are testimonial, this is one of those cases in which the narrower line to a decision is not the one that should have been followed. The importance of this issue to law enforcement, the courts, and the accused would have more than justified a complete review of the various tests, so that a great deal of subsequent litigation over individual tests could be avoided. I am required to review each test in any event, because I am of the view that none is testimonial. Whether I am correct with respect to those tests that I discuss, but that the majority does not discuss, now will have to abide the event.

1. The horizontal gaze nystagmus (HGN) test. (OAR 257-25-020(1)(a)).

This test involves an officer's asking a suspect to move the suspect's eyes in a particular way, with the officer observing the manner in which the eyes move to determine if the movement is characteristic of impairment due to alcohol, controlled substances, or both. The observations are purely physical. The HGN test is not testimonial.

2. The walk-and-turn test. (OAR 257-25-020-(1)(b)).

This test involves having a suspect walk a line for a distance, then reverse course and walk back. The suspect is directed to count the steps as they are taken, but it is self-evident that the purpose of the counting simply is to require the suspect to conduct a second, rote activity as a possible source of distraction from the primary activity. This test is designed to investigate only gross motor physical activity, which the officer once again observes to determine whether the manner in which it is performed suggests impairment. The test is not testimonial.

3. The one-leg stand test. (OAR 257-25-020(1)(c)).

Unlike the walk-and-turn test, this test has a verbal component. Under the test, the suspect is asked to stand straight up, heels together, arms at sides. The officer then asks the suspect to raise one foot approximately six inches off the ground and, while in that position and looking at that foot, to count from 1001 through 1030. The exercise then is repeated with the other foot. This test does call on the suspect to report something that is in the suspect's mind, *viz.*, the suspect's knowledge of the proper counting sequence of numbers from 1001 through 1030. However, for the reasons that follow, I do not believe that such a minimal inquiry into the suspect's knowledge produces a testimonial result.

The physical part of the one-leg stand test clearly is not testimonial. But neither is the recitation part, when its purpose is considered. The one-leg stand test is designed to determine a suspect's capacity to perform two tasks — one physical and one mental— while the officer determines from what he observes whether the *way* in which those tests are

performed indicates that the suspect should not be driving. In asking a suspect to recite numbers, the officer is using a societal commonplace (counting) that is totally fundamental, neutral, and nonspecific to the individual. Virtually every member of our society has been able to count since early childhood; an unimpaired person should be able to do so as if he or she were chanting a mantra. That is, it is the facility, rhythm, and cadence of the exercise that the officer is looking for, not whether this particular suspect knows that 1003 follows 1002.

Yet another way to look at the problem is to imagine the officer asking the suspect to recite something back to the officer that the officer dictates and that the suspect presumably is not familiar with beforehand — an exemplar. For example, the officer might ask the suspect to listen to and then recite back elementary Latin (*"hic, haec, hoc"*; *"amo, amas, amat"*) or to count by tens in German (*"zehn, zwanzig, dreizig"*). Asking a suspect to recite sequential Arabic numbers instead is a shorthand for the foregoing exercise, equally inoffensive to the constitutional protection at issue. I would hold that this test is not testimonial.

4. The Romberg balance test. (OAR 257-25-020(1)(d)).

Like the one-leg stand test, this test has a verbal component. Under the test, the suspect is asked to stand straight up, heels together, arms at sides, with eyes closed. The officer then asks the suspect various questions (the rule suggests the questions, "Where do you live?" and "What is your date of birth?") while observing the degree of swaying that occurs as the suspect tries to do two things at once. If it appeared that the content of the answers that are given had anything to do with the test, there might at least be some issue as to whether the test were testimonial. However, it is clear from the language of the rule itself that the purpose of the test is to challenge the suspect physically, not to plumb the suspect's mind. (I also note that, as to the two questions recommended by the rule, the officer routinely would be allowed to ask those questions in any event as a way of identifying the suspect, either at the scene or later at a booking facility.) I would hold that this test is not testimonial.

5. The modified finger-to-nose test. (OAR 257-25-020(1)(e)).

Again, the test involves only physical dexterity. It is not testimonial.

6. The finger count test. (OAR 257-25-020(1)(f)).

This test involves asking the suspect to hold out a hand and touch each of the fingers in turn with the thumb, counting "1-2-3-4" and "4-3-2-1." There is a verbal component, but it is like that in the walk-and-turn test. It is clear that the purpose of the test is to see how well the suspect can perform two simple activities at the same time. What we observed concerning the one-leg stand test applies equally here: The verbal component simply is too minimal, too fundamental, and too impersonal to make it testimonial in the constitutional sense.

7. The alphabet test. (OAR 257-25-020(1)(g)).

Under this test, the suspect is asked to recite the alphabet, or any portion of the alphabet that the officer chooses. The only component of the test is a verbal one. This test comes closer to being testimonial than does any other test discussed thus far: It has no physical component to go with it, so it must be intended that the specific content of the suspect's recitation will be used as evidence against the suspect. I nonetheless conclude that the test is not testimonial. As was true of the one-leg stand and finger count tests, the information that the officer elicits is not personal to the suspect, but rather is a common denominator of the culture. The alphabet commonly is learned at a very early age, and the capacity to recite it thereafter is completely unremarkable.[6] Similarly, the *inability* to recite it is less testimonial in any communicative sense than it is a portrayal of physiological impairment. I would hold that this test is nontestimonial.

---

[6] It fairly may be argued that neither Arabic numerals nor the alphabet used in the English (and most other European) languages necessarily is "fundamental" to any person whose nationality or heritage is, for example, African or Asian. That is true, but it also is a complete, nonincriminating explanation for the suspect's performance of the test.

8. The counting test. (OAR 257-25-020(1)(h)).

Under this test, the suspect is asked to count any length of numbers, forward or backward, that the officer wishes. The analysis of this test is precisely the same as that of the alphabet test. The test is not testimonial, because the information sought is so fundamental and is so completely unrelated to the individual suspect. This point is perhaps best made with an illustration: An officer might, instead of using the specific test involved here, say to a suspect: "Please recite back to me the following numbers: 23, 6, 9, 44, 18." Without question, the suspect's ability to perform that test would not be testimonial, because the sole purpose of the exercise would be to test the suspect's ability to hear, recollect, and report, not to plumb the suspect's mind for information peculiar to the suspect. Asking a suspect to deal instead with a series of numbers in the manner directed by the present test really is no different, because the almost universal awareness of those numbers serves as a practical substitute for the officer's specifically naming them. I would hold that this test is nontestimonial.

9. The internal clock test. (OAR 257-25-020(1)(i)).

Under this test, the suspect is asked to tell the officer when thirty seconds have elapsed. The officer compares the suspect's estimate with the actual passage of time. I would hold that this test, like the two that precede it, is not testimonial. Testing for a sense of the passage of such a brief period of time is not an exercise in peering into the thoughts of the suspect.

Based on the foregoing, I conclude that no part of the field sobriety tests established in OAR 257-25-020(1) violates defendant's right not to be "compelled in any criminal prosecution to testify against himself" under Article I, section 12, of the Oregon Constitution. It follows that use in a criminal proceeding of evidence of defendant's refusal to take those tests likewise does not offend Article I, section 12. The district court erred in ruling to the contrary. The majority, with its completely unimaginative and mechanistic "if the suspect opens his or her mouth, it's testimonial" approach, errs as well.

My view of the scope of the Oregon constitutional protection as not extending to defendant in the present circumstances requires me to turn now to the remaining question, which is whether all or a portion of the field sobriety tests violate defendant's rights under the Fifth Amendment to the Constitution of the United States. Again, I would hold that there is no violation.

The only argument that reasonably could be made that any part of the field sobriety tests violates the Fifth Amendment would be based on the decision of the Supreme Court of the United States in *Pennsylvania v. Muniz*, which is discussed at length above. As noted, the Court in that case held that the answer by a suspect to a question concerning the date of the suspect's sixth birthday was deemed by a bare majority of the Court to be testimonial. *Muniz*, 496 US 592-600. Even the majority of the Court in that case appeared to recognize, however, that it is not *every* verbalization that becomes testimonial. *Id.* I have attempted, in my discussion of the various field sobriety tests in connection with Article I, section 12, of the Oregon Constitution, to explain why, in my view, the unique, simplistic, and fundamental nature of the verbalizations required of suspects under those tests did not rise to the "testimonial" level. Obviously, reasonable minds can differ, and the question is a close one. But I believe that the nature of the answers called for by the Oregon tests differs so completely from the personal information sought in *Muniz* that the Supreme Court of the United States would agree that the Oregon field sobriety tests do not implicate the Fifth Amendment.[7]

The majority opinion in this case is wrong, and mischievously so. Whether it is a narrow opinion that merely causes havoc by its refusal fully to explain itself or is, instead, the harbinger of this court's complete destruction of the ability of police officers to conduct field sobriety tests, the

---

[7] At the same time, it would be disingenuous for me not to note in passing, and with the greatest respect and deference to the Court that is responsible for safeguarding federal constitutional rights, that I believe that *Pennsylvania v. Muniz*, 496 US 582, 110 S Ct 2638, 110 L Ed 2d 528 (1990), needs a thoughtful second look. Even that Court, capable as it is, can produce the occasional clinker. *See, e.g., State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 US 363, 97 S Ct 582, 50 L Ed 2d 550 (1977) (overruling, by a vote of 6-3, *Bonelli Cattle Co. v. Arizona*, 414 US 313, 94 S Ct 517, 38 L Ed 2d 526 (1973), a case decided by a 7-1 majority less than four years earlier).

unnecessary harm that it does to the public's right to be protected from intoxicated drivers is deplorable. I dissent.

Van Hoomissen and Graber, JJ., join in this opinion.

**VAN HOOMISSEN, J.,** concurring in part; dissenting in part.

I agree with the majority that the warning given by the deputy complied with the requirements of ORS 813.135.

I dissent from the majority's conclusion that the admission of a defendant's refusal to perform field sobriety tests as substantive evidence of guilt in a criminal proceeding violates Article I, section 12, of the Oregon Constitution.[1] I would hold that the trial court erred in granting defendant's motion to suppress.

---

[1] The overwhelming majority of the courts that have considered the issue have concluded that admitting evidence of a refusal to submit either to a breath-alcohol or a field sobriety test does not violate the privilege against self-incrimination. *See* Annotation, *Admissibility in Criminal Case of Evidence That Accused Refused to Take Test of Intoxication*, 26 ALR 4th 1112 (1983 & Supp 1993); Donald H. Nichols, *Drinking/Driving Litigation* § 12:04 (1933 & Cumm Supp 1993); 4 Richard E. Erwin, *Defense of Drunk Driving Cases* § 31.04, .05[2] (3d ed 1993) ("Trend is clearly toward admissibility of refusal evidence").

My research indicates that every recent Oregon Court of Appeals decision that has visited this question has held that refusal evidence is admissible in a DUII prosecution and that such use does not violate the defendant's privilege against self-incrimination, because field sobriety tests are not testimonial in nature or because the context is not compelling. *See, e.g., State v. Whitehead*, 121 Or App 619, 623, 855 P2d 1149 (1993) ("In general, a driver's performance of field tests are merely demonstrative and do not violate the driver's rights under Article I, section 12, or the Fifth Amendment."); *State v. Schaffer*, 114 Or App 328, 333, 835 P2d 134 (1992) (a request to perform field sobriety tests does not create compelling circumstances); *State v. Scott*, 111 Or App 308, 312, 826 P2d 71 (1992) (request to perform field sobriety tests does not create inherently compelling circumstances for *Miranda* purposes, as a matter of law), citing *State v. Spencer*, 305 Or 59, [70], 750 P2d 147 (1988) ("The basic concept embodied in the implied consent law is that one who drives a motor vehicle on the state's highways impliedly consents to a breath test"); *State v. Foster*, 95 Or App 144, 149, 768 P2d 416 (1989) (performance of field sobriety tests is not subject to the proscription against compelled self-incrimination); *State v. Gardner*, 52 Or App 663, 669-70, 629 P2d 412, *rev den* 291 Or 419 (1981) (the introduction of evidence of a defendant's refusal to take a sobriety test in the form of a blood or breath test does not violate his or her right against self-incrimination), citing *Schmerber v. California*, 384 US 757, 761, 86 S Ct 1826, 16 L Ed 2d 908 (1966) (Fifth Amendment privilege against self-incrimination only protects an accused from being compelled to testify against himself, or otherwise provide the state with evidence of a testimonial or communicative nature); *State v. Medenbach*, 48 Or App 133, 138-39, 616 P2d 543 (1980) (field sobriety tests are not testimonial in nature and do not violate privilege against self-incrimination).

First, as the overwhelming majority of cases from other jurisdictions hold, *taking* field sobriety tests is not "testimonial." All of the nine field sobriety tests authorized by OAR 257-25-020(1) are designed to obtain evidence of a person's coordination, psychological condition, and physical capabilities. *State v. Nagel*, 320 Or 24, 36, 880 P2d 451 (1994). Several of the tests obtain that evidence in part by having the accused speak certain common words or numbers in a certain way, but it is not the *content* of that speech that the police are seeking. *See Doe v. United States*, 487 US 201, 108 S Ct 2341, 101 L Ed 2d 184 (1988) (a court order compelling witness to execute a consent form directing the disclosure of foreign bank records did not violate the Fifth Amendment, because the communication itself did not, explicitly or implicitly, relate a factual assertion or disclose information; the content had no testimonial significance). Indeed, the *content* is selected in advance by the police; nothing original is taken from the mouth, mind, or thought of the accused. Instead, the relevance of the verbalizations required by the tests lies in what they portray of the accused's uncontrollable response to the presence of alcohol in his or her bloodstream — a physical circumstance that goes to the heart of a DUII prosecution. In this case, the police were not asking for permission to wring from defendant the innermost secrets of his mind; they were trying to determine the compatibility of his alcohol-impaired physical skills with the driving of a motor vehicle. The police had a right to do that, because the people of this state had a right to authorize them to do that.

Even when a field sobriety test requires a driver to speak in response to a direction such as "count backwards from 100 to 75," or "recite the alphabet from A to Z," *taking* the test is not "testimonial," because it does not require the driver to reveal any meaningful knowledge, understanding, or thought process. In this sense, the request is no more "testimonial" than is requiring a defendant to make a voice exemplar for comparison purposes. *See Nagel*, 320 Or at 35 (no expectation of privacy in the quality of one's voice, *i.e.*, a voice exemplar); *see also United States v. Dionisio*, 410 US 1, 93 S Ct 764, 35 L Ed 2d 67 (1973) (compelling witness to furnish a voice exemplar did not violate Fifth Amendment); Annotation, *Requiring Suspect or Defendant in Criminal*

*Case to Demonstrate Voice for Purposes of Identification*, 24 ALR 3d 1261 (1969 and Supp 1994). Within the meaning of Article I, section 12, none of the field sobriety tests reveals anything about a driver's "state of mind." None of the tests reveals anything about a driver's "beliefs or knowledge."[2] It is no more "testimonial" than ordering a defendant to speak a paragraph of text to permit another person to comment on any similarity in characteristics between the speaker's voice and that of another. In such cases, refusal to submit is a physical act rather than a communication, and for that reason it is not protected by the privilege.[3] Evidence of refusal to take a potentially incriminating test is similar to other circumstantial evidence of consciousness of guilt, such as escape from custody and suppression of evidence. Defendant's *refusal* to submit to field sobriety tests in this context is not "testimonial" within the meaning of Article I, section 12. I agree with Justice Gillette's analysis on this point.

The following text from a recent opinion of the Court of Special Appeals of Maryland correctly states my view of this matter:

> "[Appellant's] performance of [reciting the alphabet and doing the finger-to-nose] tests was not compelled self-incrimination protected by the Fifth Amendment. * * * Because performance of these tests did not reveal any subjective knowledge or thought processes of the appellant, he did

---

[2] The majority does not explain whether "state of mind" is the equivalent of "beliefs or knowledge," or whether those are two different things. Neither concept is defined or explained by the majority.

[3] The majority does not explain why the specific tests it has chosen are "testimonial," rather than physical. The majority states only that "There can be no doubt that those aspects of the field sobriety tests require the individual to communicate information to the police about the individual's beliefs, knowledge, or state of mind." 321 Or at 60. If one can say that there is "no doubt" about something, one ought to be able to explain in a paragraph precisely *why* there is no doubt. The majority here has not done so. For the reasons cogently explained by Justice Gillette in his dissent, it is not in the least clear to at least three members of this court why each of the tests selected by the majority constitutes a testimonial communication by the driver. How, for example, would asking a driver to read a series of numbers from a printed card disclose the driver's "beliefs or knowledge?" How is that any different from requiring a defendant to read a passage from a printed script? *State v. Nagel*, 320 Or 24, 880 P2d 451 (1994); *United States v. Dionisio*, 410 US 1, 193 S Ct 764, 35 L Ed 2d 67 (1973). Would it make any difference if the officer had asked the driver to manipulate, rather than to simply repeat, a series of numbers (*e.g.*, read only the *even*-numbers on the card)? By its lack of analysis and dogmatic approach to those questions, the majority, mischievously, raises far more questions than it answers.

not thereby supply the State [with] any testimony or communication within the protection of his privilege against self-incrimination. This view accords with that reached by a vast majority of the courts which have considered the issue. (citing cases)." *McAvoy v. State*, 70 Md App 661, 523 A2d 618, 623 (1987).

Second, I agree with Justice Graber that defendant's refusal to submit to field sobriety tests in this context is not "compelled" within the meaning of Article I, section 12. The majority advances no principled explanation for concluding that such a refusal is "compelled" in the constitutional sense.[4]

Third, ORS 813.135 provides in part:

"Any person who operates a vehicle upon * * * the highways of the state *shall be deemed to have given consent to submit to field sobriety tests* upon the request of a police officer for the purpose of determining if the person is under the influence of intoxicants if the police officer reasonably suspects that the person has committed the offense of driving while under the influence of intoxicants in violation of ORS 813.010 or a municipal ordinance." (Emphasis added.)

Whatever Article I, section 12, right a driver may have, the driver has waived that right by impliedly consenting to submit to field sobriety tests in this context. *Cf. State v. Newton*, 291 Or 788, 793-98, 636 P2d 393 (1981) (tracing the history of blood alcohol implied consent statutes). ORS 813.135 explicitly states that such consent has been given. Because defendant consented to submit to field sobriety tests, Article I, section 12, is not implicated. Moreover, simply because the driver has consented (under the implied consent law) to make that choice, and to face the statutory consequences, when the driver exercises his or her driving privileges in Oregon, the choice of refusing to take field sobriety tests is not "compelled."

---

[4] In *Nagel,* 320 Or at 44 (Van Hoomissen, J., concurring in part; specially concurring in part), I agreed with the majority opinion that the administration of field sobriety tests constitutes a "search" within the meaning of Article I, section 9, of the Oregon Constitution. I now confess reservations about the correctness of that holding. In the context of this case, where defendant refused to submit to field sobriety tests, I am persuaded that no search occurred at all. Assuming that it is a "search," presumably, a voluntary consent can justify the search.

Fourth, because of the *pervasive regulation* to which the activity of driving has been subjected in this state, where that activity is concerned, a driver has a reduced level of constitutional protection.[5] *Cf. Mackey v. Montrym*, 443 US 1, 17-18, 99 S Ct 2612, 61 L Ed 2d 321 (1979) (recognizing state's "compelling interest in highway safety"); *Bibb v. Navajo Freight Lines*, 359 US 520, 523-24, 79 S Ct 962, 3 L Ed 2d 1003 (1959) ("The power of the State to regulate the use of its highways is broad and pervasive. * * * [S]afety measures carry a strong presumption of validity"). ORS 813.135 and 813.136 are permissible limitations on the Article I, section 12, right of any person who drives on Oregon's highways.

The administration of field sobriety tests and the use in court of a driver's refusal to take those tests, therefore, does not, on its face, violate Article I, section 12, in the manner argued by defendant.

Although the majority did not address defendant's arguments under the Fifth and Fourteenth Amendments, I would reach the same conclusion under the federal constitution. The Fifth Amendment's protection applies only when the accused is compelled to make a testimonial communication that is incriminating. *Baltimore Soc. Serv. v. Bouknight*, 493 US 549, 554, 110 S Ct 900, 107 L Ed 2d 992 (1990). The challenged statutes and their implementing rules do not violate defendant's Fifth and Fourteenth Amendments rights in the manner argued by defendant. *Cf. Pennsylvania v. Muniz*, 496 US 582, 110 S Ct 2638, 110 L Ed 2d 528 (1990); *South Dakota v. Neville*, 459 US 553, 562-64, 103 S Ct 916, 74 L Ed 2d 748 (1983).

The majority opinion in this case is very narrow in scope. It holds no more than that certain *specific* tests are "testimonial," thereby making it unconstitutional to require a person accused of DUII either to consent to perform those specific tests or to have the person's refusal used against the person in subsequent criminal proceedings. Regrettably, the

---

[5] For similar treatment of "seizures" under Article I, section 9, *see State v. Holmes*, 311 Or 400, 813 P2d 28 (1991) (upholding constitutional permissibility of certain kinds of stops on less than probable cause). *See also State v. Ainsworth*, 310 Or 613, 619, 801 P2d 749 (1990) (aerial surveillance of private property did not invade occupants' privacy).

majority opinion does not identify *which tests* that it concludes are "testimonial." Because the majority opinion does not answer the question whether a driver's refusal to take specific field sobriety tests that do not contain a verbal, *i.e.*, "testimonial," component will be admissible in evidence under ORS 813.136 at that driver's DUII trial, *see* 321 Or at 59 n 6, law enforcement officers, litigants, lawyers, judges, and the legislature[6] are left to speculate on the outcome of hundreds, if not thousands, of future DUII prosecutions that will arise before that question is answered by this court.

In the interim, I suppose that officers may be instructed by their superiors to decline to administer *any* field sobriety tests. *See* OAR 257-25-020(2) (officer has discretion to administer any, all, or none of the tests). Or they may be instructed to administer only field sobriety tests that contain no verbal component and, therefore, do not require a driver to speak.[7] Before doing so, however, an officer should specifically advise a driver that *none* of the tests to be taken will require the driver to speak. That is to say, that none of the tests call for a *verbal* response. Generally, an officer always may testify at trial about what the officer observed at the scene of the stop, *e.g.*, the driver's erratic driving, unstable walking, the fumbling manner in which the driver produces his or her driver's license at the officer's request, odor of alcohol, bloodshot eyes, slurred speech, lack of coordination, *etc. See* OAR 257-25-010(1)(a) to (n) (acts, signs, or symptoms of probable impairment not listed and not administered as field sobriety tests). In every case, the officer should make a good record of what he or she has observed in gathering any such physical evidence.[8]

I join the dissents of Gillette, J., and Graber, J.

---

[6] The majority opinion will leave the legislature without a clue as to what it may, or should, do to address the problems the majority holding creates.

[7] In doing so, the state runs the risk that some future court will conclude that *all* of the current field sobriety tests are "testimonial," although such a holding obviously is not compelled by the majority holding here.

[8] Because this is an appeal from an order made before trial suppressing evidence, ORS 138.060(3), the state may proceed to trial in this case using *its other evidence* to attempt to prove DUII.

**GRABER, J.,** concurring in part and dissenting in part.

I concur in the majority's holding that the warning given by the officer sufficiently informed defendant of his right to refuse to take field sobriety tests and of the consequences of refusal. The requirements of ORS 813.135 and 813.136 and their implementing rules, relating to what a detained driver must be told, were met.

For the reasons discussed below, however, I dissent from the majority's holding that defendant's right against self-incrimination under Article I, section 12, of the Oregon Constitution, was violated. The majority departs from established Article I, section 12, analysis, by failing to focus on the setting in which the police interrogation occurs.

## ARTICLE I, SECTION 12

Article I, section 12, provides in part: "No person shall * * * be compelled in any criminal prosecution to testify against himself." The majority recognizes that, to receive protection under the self-incrimination clause of Article I, section 12, a person's statements or acts must be *both* "testimonial" *and* "compelled." 321 Or at 53. The constitutional prohibition is not against all self-incrimination, but only against "compelled" self-incrimination. The constitution does not require suppression of responses made to a police officer, including refusals to give information, during a lawful, noncompelling encounter. I would hold that the evidence challenged here — defendant's refusal to take field sobriety tests — was not "compelled."[1]

Under Article I, section 12, this court has considered the concept of compulsion in determining whether a defendant is entitled to *Miranda*-like warnings.

"In determining whether *Miranda*-like warnings [are] required by the Oregon Constitution, we must assess the extent to which defendant was 'in custody.' In Oregon, a defendant who is in 'full custody' must be given *Miranda-*

---

[1] Because defendant's refusal to take the tests was not compelled, we need not decide whether the challenged tests, or refusal to submit to those tests, elicits "testimonial" evidence within the meaning of Article I, section 12. With respect to that point, however, I agree generally with the views expressed by Justice Gillette in his opinion in this case.

like warnings prior to questioning. *State v. Magee,* 304 Or 261, 265, 744 P2d 250 (1987). In addition, such warnings may be required in circumstances that, although they do not rise to the level of full custody, create a 'setting which judges would and officers should recognize to be "compelling" ' *Id."* *State v. Smith,* 310 Or 1, 7, 791 P2d 836 (1990) (footnote omitted).

In that case, the court held that the defendant was not in custody and that his surroundings did not create a setting of compulsion. *Id.* at 8. Accordingly, his statements to the police were admissible in evidence at his trial, despite the absence of warnings. *Ibid.*

*Smith* addressed the question of when *Miranda*-like warnings are required under Article I, section 12, and held that they must be given in *any* setting involving compelled police interrogation. The compulsion analysis in *Smith* was not limited to the issue of when *Miranda*-like warnings are necessary, however; *Smith* covered *all* forms of compulsion arising in the context of police interrogation. The requirement of warnings is simply one result of determining that compulsion is involved. *Smith* represents a closed set. If self-incriminating testimony was elicited during police interrogation under circumstances that rendered the testimony "compelled" within the meaning of Article I, section 12, then *Miranda*-like warnings were required; such warnings are required *whenever* self-incrimination is compelled during police interrogation; and a defendant cannot successfully assert a violation of the right to be free from compelled self-incrimination under Article I, section 12, during police interrogation unless the defendant was in a setting that demanded the prior administration of such warnings, because only such settings are compelling for Article I, section 12, purposes. Thus, *State v. Smith* sets the relevant standard under Article I, section 12, for the present case.

In *Smith,* this court held that *Miranda*-like warnings are required *both* when a person is in "full custody" *and* when a person is in any other "setting that judges would * * * recognize to be compelling." 310 Or at 7 (citation omitted) (internal quotation marks omitted). In *Smith* terms, the issue in the present case becomes whether, during a valid stop (*i.e.*, a stop that is neither custodial nor coercive), the request

to administer field sobriety tests constitutes "full custody" or "create[s] a setting which judges would and officers should recognize to be compelling," *ibid.* (internal quotation marks omitted), within the meaning of Article I, section 12. This opinion next applies that two-part analysis.

First, a driver who is asked to take the challenged field sobriety tests, without more, is not in "full custody." *See Smith*, 310 Or at 7 (stating that standard); *see also* ORS 133.005(1) (defining to "arrest" in part as "to place a person under actual or constructive restraint or *to take a person into custody* for the purpose of charging that person with an offense" (emphasis added)). A driver who has merely been stopped is not under arrest when the request is made to take the tests or when responding, affirmatively or negatively, to that request. *See State v. Vu*, 307 Or 419, 425, 770 P2d 577 (1989) (a driver stopped for traffic infractions and then questioned was not entitled to *Miranda*-like warnings under Article I, section 12, because he was not in custody or under compulsion in the constitutional sense).

I next consider whether, in the circumstance that defendant faced, ORS 813.135 and 813.136 and their implementing rules "create a setting which judges would and officers should recognize to be compelling." *See Smith*, 310 Or at 7 (stating that standard) (internal quotation marks omitted). After a police officer has asked a driver to submit to field sobriety tests, the driver may refuse to do so, albeit with possible evidentiary consequences. No direct punitive consequences flow from a refusal to take the challenged field sobriety tests. The officer's request during a valid stop does not, in my view, create a setting that is "compelling."

Most of the majority's opinion is devoted to demonstrating that some aspects of the field sobriety tests and the failure to submit to them are "testimonial" within the meaning of Article I, section 12. 321 Or at 53-57, 58-60. Assuming that a refusal to take the field sobriety tests is "testimonial," the majority advances no principled explanation for concluding that such a refusal is "compelled" in the constitutional sense. Instead, what little the majority says on the subject boils down to this construct:

1. All choices that the driver faces are testimonial.

2. All choices that the driver faces are incriminating.

3. Therefore, the requirement to choose is compulsion. 321 Or at 57-58, 60-63.

Under existing case law, that construct is faulty. An example will illustrate the point. Suppose that a police officer lawfully stops someone for speeding; it is afternoon, the officer is alone, and the location is a well-traveled commercial street. The officer asks the driver, "What do you know about the robbery at the grocery store that happened 10 minutes ago, a few blocks from here?" The driver has three choices: (1) she can confess to the robbery, either by words or by flight; (2) she can deny any knowledge of the robbery (which, if she is the robber, is a lie); or (3) she can refuse to cooperate, either by words or by silence. All three choices are testimonial; assuming that the driver is the robber, all are incriminating. Are the driver's responses nonetheless admissible in evidence at her trial for robbery of the grocery store? Under present law, they are, because the setting in which the evidence was obtained, at the time it was obtained, was not compelling in a constitutional sense.

In other words, this court's prior cases on compulsion under Article I, section 12, have stated or assumed that the questioned person's choices all were testimonial and incriminating; but that has been only the starting point, not the ending point, of the analysis of compulsion. That analysis has focused on the nature of the defendant's encounter with the police. Here, the majority fails to focus on the nature of defendant's encounter with the police. Were it to do so, its result would not withstand scrutiny.

As discussed above, under *Smith* and *Vu* the valid stop itself is not compelling; defendant's acts and statements, whether testimonial or not, cannot be deemed "compelled" under Article I, section 12, because they do not occur in a setting that is compelling. That examination of the setting in which evidence was obtained — at the time it was obtained — is the test heretofore applied by this court.

Does the existence of a statute mandating that the police inform the driver of the consequence of refusal make the encounter "compelling" within the meaning of Article I, section 12? I believe that the answer is "no."

ORS 813.136 represents a particularized codification of the usual principle that responses to police questioning are admissible in evidence unless given under compulsion. One of the functions of the statutes under consideration is to tell drivers about that usual principle of admissibility. *See* ORS 813.135 ("Before the tests are administered, the person requested to take the tests shall be informed of the consequences of refusing to take or failing to submit to the tests."). Accordingly, ORS 813.135 and 813.136 give drivers more information about the result of their failure to take field sobriety tests than they would receive in the absence of a statute. If the statutes give drivers *more* information than they need receive under Article I, section 12, the statute does not have the effect of *denying* a constitutional protection. The informational aspect of the statutes does not make a noncompelling setting compelling for Article I, section 12, purposes.

Does the fact that the driver must make a choice between testimonial, incriminating courses of action — without more — make the encounter "compelling" within the meaning of Article I, section 12? Again, I believe that the answer is "no." To require the making of a choice between two courses of action is not the same as to compel either of the two courses of action. *See South Dakota v. Neville*, 459 US 553, 564, 103 S Ct 916, 74 L Ed 2d 748 (1983) (citing *Crampton v. Ohio*, decided with *McGautha v. California*, 402 US 183, 213-17, 91 S Ct 1454, 28 L Ed 2d 711 (1971), Court held: where a state statute gave the defendant the choice of submitting to a blood-alcohol test or refusing to do so, the defendant's "refusal to take a blood-alcohol test, after a police officer [had] lawfully requested it, [was] not an act coerced by the officer, and thus [was] not protected by the privilege against self-incrimination").

Does the existence of a statute mandating introduction of evidence obtained during the encounter make an otherwise noncompelling setting into a compelling setting? Once again, I believe that the answer is "no."

A "yes" answer would make the *result* of a compulsion analysis (admissibility of evidence versus inadmissibility) into the analysis itself. Exclusion of evidence is not a separate right. Rather, it is a consequence of compulsion or of some other violation of a defendant's constitutional rights.

*See State v. Davis*, 313 Or 246, 253-54, 834 P2d 1008 (1992) (exclusionary rule is a means to vindicate the right of an individual defendant when evidence has been "obtained in a manner contrary to Oregon's constitutional rules"). ORS 813.136 is limited to stating a result — admissibility. The logical consequence of the majority's reasoning is this: If the legislature enacts a statute providing that "evidence gained from a suspect by an investigating police officer in a noncompelling setting shall be admissible in evidence," such evidence would be *inadmissible* because of the statute, even though such evidence now is *admissible* on the ground that it has not been obtained in a manner contrary to Oregon's constitutional rules.

Such an analysis makes no sense. The existence of a statute describing the result of what evidence is admissible, in a later court proceeding, does not transform the nature of the setting in which the challenged evidence was *obtained* in the first place. Stated another way, the fact that a statute says that acts and statements occurring in a noncompelling setting may be used against a defendant does not make the original setting compelling, retroactively.[2]

The majority's assertion that the statutes compelled defendant's *refusal* to take the tests also fails for another reason. The majority ignores the unidirectional nature of the

---

[2] The majority sets up and knocks down a sympathetic straw person when it asserts:

"[I]n response to a police officer's request to submit to field sobriety tests, if defendant were to say, 'I am exercising my right to remain silent under Article I, section 12, of the Oregon Constitution,' that response would be treated as a refusal to perform the tests, and the refusal would be admissible as substantive evidence of guilt under ORS 813.135 and ORS 813.136. It is fundamental that the assertion of the right against self-incrimination cannot be considered as evidence of guilt." 321 Or at 61.

That passage is misleading. The operative fact under ORS 813.136 is that the "person refuses or fails to submit to field sobriety tests as required by ORS 813.135"; in that event, "evidence of the person's refusal or failure to submit is admissible."

This case provides a good illustration of how such evidence sounds:

"[DEPUTY]: * * * I asked him to step out of the truck to perform a series of field sobriety tests.

"[PROSECUTOR]: And did he, in fact, take those field tests?

"[DEPUTY]: No, he did not."

Irrelevant or unduly prejudicial embellishments presumably would be excluded, upon proper objection.

pressure inherent in the statutes. "The main purpose of the second sentence of ORS 813.135 was * * * to bring further pressure on suspected intoxicated drivers *to take* the field sobriety tests." *State v. Trenary,* 316 Or 172, 177, 850 P2d 356 (1993) (emphasis added).[3] That "further pressure" exists to discourage suspected intoxicated drivers from refusing to take the tests; if "compulsion" can be found in the statutes, that compulsion exists *only* to push drivers to take the tests, not to refuse. The "compulsion" that the majority finds as to *refusal* simply does not exist.

In *State v. Green,* 68 Or App 518, 523-24, 684 P2d 575, *rev den* 297 Or 601 (1984), then Judge (now Justice) Gillette emphasized the foregoing kind of distinction.

"The dispositive issue is not whether evidence of the refusal is communicative but whether the communication is the result of governmental compulsion of the sort which Article I, section 12, forbids. The right not to testify against oneself does not prevent the state from using defendant's out-of-court statements or other communicative activity as evidence. Rather, it prevents the state from *requiring* a defendant to provide such statements or activity. Thus, inculpatory statements to friends, relatives, accomplices and others are generally admissible if there is no improper governmental activity in procuring them. Statements to police or other authorities are also admissible if voluntarily made, either before custodial interrogation begins or, if made during custodial interrogation, after a knowing and voluntary waiver of *Miranda* rights.

"These principles apply equally to non-verbal activity with communicative effects. Thus, evidence of flight is admissible to show a defendant's consciousness of guilt. If the jury finds that a defendant's flight shows a consciousness of guilt, it has found that the defendant has, in effect, said, 'I know that I am guilty, so I don't want to be caught and tried.' The conduct is communicative, and it is the communicative effect that the state places in evidence. It is permitted to do so, however, not just because of the nature of the evidence but also because the communication is not compelled; if the state seeks to compel anything, it is that defendant *not* flee

---

[3] In *Trenary,* the issue of statutory construction presented was whether the failure of a police officer to inform a driver of the consequences of *refusing* to take field sobriety tests required suppression of the test results when the driver in question *took* the tests anyway. This court said "no." 316 Or at 178.

and thus that he *not* communicate." (Footnotes omitted; citations omitted; emphasis in original.)

The Court of Appeals in *Green* also recognized that the *key* issue is *whether the evidence of refusal is compelled*, not whether it is testimonial.

In *State v. Carlson*, 311 Or 201, 808 P2d 1002 (1991), this court likewise recognized the importance of the link between what makes the evidence "testimonial" and what makes the evidence "compelled." In *Carlson*, the defendant challenged his conviction for possession of a controlled substance. 311 Or at 203. The Oregon constitutional issue was whether the defendant was in a setting that entitled him to receive *Miranda*-like warnings before being questioned by a police officer. *Id.* at 204-05. The defendant argued that admission of statements that he made to a police officer about needle marks on his arms violated his Article I, section 12, right against self-incrimination. *Ibid.* The court stated that

> "the fact that police question a person as a suspect in a crime 'does not inherently create a "compelling" setting for Oregon constitutional purposes.' *State v. Smith, supra,* 310 Or at 11. The circumstances of this case do not rise to the level of custody or compulsion that require *Miranda*-like warnings. Accordingly, the admission of defendant's statements did not violate defendant's rights under Article I, section 12, of the Oregon Constitution." 311 Or at 205.

After addressing, and rejecting, the defendant's constitutional argument that the *setting* was compelling for Article I, section 12, purposes, the court held that the defendant's statements were admissible at trial. *Id.* at 205. The foregoing passage demonstrates that this court looks to the *setting* in which one suspected of illegal activity makes a statement, to determine whether that setting is compelling. If the setting is compelling, the evidence is not admissible. If the setting is not compelling, the evidence is admissible.

Once the setting in which the statements were made is deemed "compelled" or "non-compelled," all forms of testimonial evidence — silence, acts, and statements — receive the same treatment from the perspective of Article I, section 12. The analysis undertaken by the court in *Carlson*, *after* the court resolved the Article I, section 12, compulsion issue, makes this apparent and counters the suggestion made

by defendant in this case that silence in the face of police questioning is entitled to greater protection than speech, even in a setting devoid of compulsion.

After the court in *Carlson* determined that the defendant was in a noncompelling setting, the court addressed whether a police officer's testimony about the defendant's nonverbal response (head-shaking) to an accusatory statement made by the defendant's wife during the defendant's interaction with the police was admissible at trial as an adoptive admission by the defendant. The court held that the defendant's silence was not admissible, because his nonverbal conduct was "so ambiguous that it cannot reasonably be deemed sufficient to establish that any particular interpretation" was intended. *Id.* at 214. As the opinion in *Carlson* makes clear, however, had the defendant's nonverbal conduct been unambiguous, evidence of it would have been admitted at trial. That is because the defendant's conduct was not compelled. The defendant's silence, like his statement, arose out of a noncompelled setting. The only question that the court needed to address, after resolving the compulsion issue, was whether the evidence complied with applicable Oregon Rules of Evidence.

*Carlson* offers the proper mode of analysis for challenges under the self-incrimination clause of Article I, section 12. The focus for determining whether a response to police questioning was compelled (whether that response be an act or a statement or silence) is to look at the setting at the time of the response. A conclusion about compulsion for Article I, section 12, purposes flows from the nature of one's encounter with the police. It is that setting that determines whether the self-incrimination provisions of Article I, section 12, take effect, not that setting *and* what happens later at trial. The court made that clear in *Carlson*; the majority offers no justification for deviating from that analysis today.

In summary, a driver's refusal to take field sobriety tests in the circumstances presented is not "compelled" within the meaning of Article I, section 12. Accordingly, the challenged statutes and their implementing rules do not violate Article I, section 12, in the manner argued by defendant.

## FIFTH AMENDMENT

Because I would hold that the challenged statutes and their implementing rules do not violate defendant's Article I, section 12, rights, I would reach defendant's federal constitutional claim as well. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court reaches federal constitutional argument after rejecting state constitutional argument). Defendant's argument fails under the Fifth Amendment to the Constitution of the United States, which provides in part: "No person * * * shall be compelled in any criminal case to be a witness against himself."

Under the federal constitution, suppression of evidence concerning a defendant's testimony is not required unless that testimony was elicited during "custodial interrogation." *Pennsylvania v. Muniz*, 496 US 582, 600-02, 110 S Ct 2638, 110 L Ed 2d 528 (1990). As in the state constitutional analysis, above, it is unnecessary to decide whether the challenged field sobriety tests are designed to elicit "testimonial" evidence within the meaning of the Fifth Amendment or whether a refusal to perform such tests is itself testimonial. Even if testimonial evidence is involved, the Supreme Court's cases demonstrate that a person in defendant's circumstance has not been subjected to "custodial interrogation" within the meaning of the Fifth Amendment.

As noted above, the Supreme Court of the United States has held that a driver's refusal to take a blood-alcohol test, after a police officer lawfully requested it, was admissible at his trial for driving while intoxicated. His refusal was not coerced and therefore was not protected by the privilege against self-incrimination. *Neville*, 459 US at 564. The Court stated that, "[i]n the context of an arrest for driving while intoxicated, a police inquiry of whether the suspect will take a blood-alcohol test is not an interrogation within the meaning of *Miranda*. * * * Respondent's choice of refusal thus enjoys no prophylactic *Miranda* protection outside the basic Fifth Amendment protection." *Id.* at 564 n 15. Citing *Crampton*, the Court recognized "that the choice to submit or refuse to take a blood-alcohol test will not be an easy or pleasant one for a suspect to make. But the criminal process often requires suspects and defendants to make difficult choices." *Neville*, 459 US at 564. The Court concluded that "no impermissible

coercion is involved when the suspect refuses to submit to take the test, regardless of the form of refusal." *Id.* at 562.

In *Pennsylvania v. Bruder*, 488 US 9, 11, 109 S Ct 205, 102 L Ed 2d 172 (1988), the Supreme Court considered whether a driver who was stopped by " 'a single police officer,' " was asked " 'a modest number of questions,' " and was asked to " 'perform a simple balancing test at a location visible to passing motorists,' " was entitled to receive *Miranda* warnings. Among the "questions" that the officer "asked" the suspect was a request to recite the alphabet. *Id.* at 9-10. The Court did not discuss separately the import of that recitation. Instead, the Court held that the driver was not entitled to receive *Miranda* warnings during the stop, because he was not in custody during that time. *Id.* at 11. *See also Berkemer v. McCarty*, 468 US 420, 436-40, 104 S Ct 3138, 82 L Ed 2d 317 (1984) (Supreme Court reviewed purposes of *Miranda* rule and concluded that, although a traffic stop "significantly curtails the 'freedom of action' of the driver," police questioning of a driver incident to a traffic stop is "quite different from stationhouse interrogation," in that the driver normally does not feel "completely at the mercy of the police" and "the typical traffic stop is public"; "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*.").

The Supreme Court cases cited above answer defendant's Fifth Amendment argument. The field sobriety tests are not requested during custodial interrogation. Therefore, the challenged statutes and their implementing rules do not violate the Fifth Amendment in the manner argued by defendant.

## CONCLUSION

In summary, I am not persuaded by defendant's arguments. I would hold that the trial court erred in granting defendant's motion to suppress evidence of his refusal to take field sobriety tests. I respectfully dissent from the majority's contrary holding.

Van Hoomissen, J., joins in this opinion.