Argued and submitted June 14; resubmitted In Banc September 11, 1996, affirmed March 26, petition for review denied October 21, 1997

## STATE OF OREGON,
*Respondent,*

*v.*

## KEVIN NIELSEN,
*Appellant.*

### (C93-03-31616; CA A83396)

936 P2d 374

Wayne Mackeson argued the cause and filed the brief for appellant.

Jonathan H. Fussner, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

LANDAU, J.

Edmonds, J., dissenting.

**LANDAU, J.**

Defendant appeals judgments of conviction for two counts of Assault in the Second Degree, ORS 163.175, and one count of Driving Under the Influence of Intoxicants (DUII), ORS 813.010. He argues that the trial court should have suppressed the evidence of field sobriety tests that he performed, because the tests constituted compelled self-incrimination under Article I, section 12, of the Oregon Constitution, and under the Fifth Amendment to the United States Constitution. He also argues that the trial court should have suppressed his statements to officers and the results of the breath and blood tests administered to him, because the evidence was obtained through unlawful police conduct. We agree with the state that the admission of evidence of the field sobriety tests, the evidence of defendant's statements to the officers and the results of breath and blood tests violated neither the state nor the federal constitutions and therefore affirm.

In so doing, we acknowledge that, during the pendency of this appeal, the voters of this state enacted "Ballot Measure 40," which, among other things, requires that Article I, sections 9 and 12, of the Oregon Constitution "not be construed more broadly than the United States Constitution." No party, however, has urged us to consider in this case the applicability and meaning of the measure. We solicited briefing from the parties on the matter *sua sponte.* In response, the state informed us that the Supreme Court also has solicited briefing on that and related matters and has the matter now under advisement and that we should hold this and all other cases to which Ballot Measure 40 may apply in abatement. We conclude that, because the Supreme Court has the matter under advisement, it would be of no benefit to decide the applicability and meaning of relevant Ballot Measure 40 issues. We also conclude, however, that it would be of no benefit simply to warehouse all criminal cases until the Supreme Court decides the matter. Accordingly, we decide this case without regard to Ballot Measure 40 and leave it to the parties to seek review as appropriate following the Supreme Court's anticipated decision.

The facts are not in dispute. In the early morning hours of February 28, 1993, defendant was driving his car

north on southwest Macadam Avenue in Portland when he hit a car traveling in front of him in the same direction. The other car careened off the road and rolled down a steep embankment. Officer DeLand was the first officer to contact defendant at the accident scene. Although DeLand observed that defendant had a slight odor of alcohol on his breath and that his eyes were bloodshot, he did not believe that defendant was intoxicated. Defendant explained to DeLand that he had been traveling northbound in the left lane on Macadam when a car in the right lane suddenly slammed on its brakes and swerved into his lane, causing him to hit it. Officer Wyatt was also at the accident scene and noticed what he considered to be an overwhelming odor of alcohol coming from defendant's breath, that defendant's speech was slurred, that he had red, bloodshot eyes and that he swayed while standing. Wyatt testified that, although he believed that defendant was obviously under the influence of intoxicants when he first made contact with him, he did not say anything to DeLand about defendant's state of sobriety because DeLand was conducting the contact. Wyatt then left DeLand and defendant to direct traffic further down the road.

One and one-half hours later, Wyatt returned to the accident scene and was surprised to see defendant still there. At the time, defendant was showing DeLand the skid marks and explaining how the marks could not have been made by his car. Wyatt approached defendant again. Based on observations similar to those he had made earlier, he requested and received permission from DeLand to have defendant perform field sobriety tests.

Wyatt asked defendant to look into his eyes and performed a Horizontal Gaze Nystagmus (HGN) test. He then asked defendant how much alcohol he had consumed that night, and defendant replied that he had consumed one eight-ounce beer four hours earlier. Wyatt then told defendant:

> "I am concerned about the amount of alcohol you have had to consume this evening. I'm about to ask you some questions. I'm about to ask you to perform some tests. I need to let you know that [the] failure to answer these questions or [the] failure to perform these tests can be used against you in court."

Defendant agreed to answer the questions and to perform the field sobriety tests.

Wyatt first asked defendant how much education he had received and whether he had any physical problems. He then instructed defendant to perform the walk-and-turn test by standing with his left foot behind his right foot with the left toe touching the right heel. Defendant was unable to stand as requested and finally told Wyatt that he could not perform the test. Wyatt then had defendant stand on one leg, and raise the other roughly six inches off the ground, while keeping his hands down to his sides, looking at his toe and counting from 1 to 30 by thousands. Defendant did not keep his hands down to his sides and had trouble counting but was able to keep one foot off the ground for the entire test by twisting his foot and raising his arms. Finally, Wyatt had defendant perform a "modified" Romberg Balance Test in which he was asked to stand with his feet together, "toes touching, heels touching side-by-side, and then to put [his] hands down to [his] side, to close [his] eyes and tip [his] head back like so and just say the alphabet A to Z." Although defendant was able to say the entire alphabet, Wyatt observed that his speech was slurred and that he swayed. Wyatt told defendant that he was not arresting him at that time but that defendant should not leave. Wyatt left defendant to speak with DeLand; 15 minutes later, he returned, arrested defendant and advised him of his *Miranda* rights. Wyatt asked defendant if he understood his rights, and defendant answered in the affirmative. Wyatt advised defendant that he would be asking him some more questions, asked if he understood and if it was "okay" to ask him questions. Defendant again said "yes." Wyatt then interrogated defendant about the details of the accident.

Eventually, defendant was transported to a police station and consented to an alcohol breath test. It had been almost three hours since the accident occurred. The Intoxilizer machine test result indicated defendant's blood alcohol content was .12 percent. Wyatt then was ordered by his superior to obtain two blood tests from defendant. Before the blood was drawn, Wyatt showed defendant the breath test result, and defendant complained that the machine could not have registered such a high result from just one eight-ounce

beer consumed several hours earlier. Wyatt told defendant that a blood test was another test to measure blood alcohol content, and that by obtaining a blood test, they would have more proof as to whether defendant was above or below the legal limit. Defendant asked Wyatt what would happen if he refused the blood draw, and Wyatt told him that he would seek a warrant if defendant refused. Defendant then consented to the blood draws. The first blood test indicated defendant's blood alcohol content to be .13 percent. The second test, done an hour later, registered a result of .11 percent.

Eventually, defendant was charged with the crimes. Before trial, he moved to suppress the evidence of all the statements that he had made to the officers, the evidence of the results of the field sobriety tests and the evidence of the breath and blood test results. The trial court suppressed the blood test results regarding the DUII count but denied the rest of defendant's motions. At trial, the jury convicted defendant on all counts.

On appeal, defendant argues that the trial court erred in failing to grant his pretrial motions to suppress. He first argues that because Wyatt did not advise him of his *Miranda* rights before he asked defendant how much alcohol he had consumed, defendant's answer constituted compelled self-incrimination. In particular, he argues that because he had been at the accident scene for two hours, he was in a "compelling" situation tantamount to custody when he answered the question. *Miranda* warnings may be required in circumstances that "create a 'setting which judges would and officers should recognize to be "compelling." ' " *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990). The state argues that there is no evidence that defendant was "compelled" to remain at the scene of the accident. To the contrary, the state argues, defendant voluntarily contacted officers during the two hours following the accident and freely discussed with them the details of the accident.

We agree with the state that the record is not persuasive that defendant was "compelled" to remain at the accident scene. Once defendant answered DeLand's initial questions and provided DeLand with his driver's license and registration information, there is no evidence that any of the

officers told him he could not leave, nor is there other evidence of compelling circumstances. Moreover, Wyatt's request that defendant perform the HGN test and his question regarding the consumption of alcohol did not compel defendant to answer that question. Rather, as the state suggests, the evidence is that defendant remained at the scene voluntarily and consented to Wyatt's initial requests. We conclude that the admission of defendant's statement that he had consumed an alcoholic beverage[1] did not violate his rights under Article I, section 12.[2]

Defendant next argues that, because Wyatt incorrectly told him before he performed the field sobriety tests that his refusal to *answer questions* could be used against him in a court,[3] the later *Miranda* warning was insufficient to advise him of his rights under Article I, section 12, and the Fifth Amendment. Therefore, his statements made after his arrest should be suppressed. Defendant explains in his brief:

> "At no time did Officer Wyatt ever tell defendant that what he had previously told him, that his failure to answer questions could be used against him in court no longer applied. A reasonable person would not conclude that the *Miranda* warnings in any way revoked the earlier admonition that his failure to answer questions could be used against him in court. * * * [A] person would naturally construe all the warnings together. In other words, a person would reasonably understand that he did not have to answer questions, but if he did assert his right to remain silent, silence could still be used against him in court."

The state counters that Wyatt's statement must be considered in context. It argues that:

> "[T]he officer told defendant, 'I'm about to' ask you some questions, and failure to answer 'these questions' could be

---

[1] The state did not offer the HGN test results into evidence at trial.

[2] We also conclude that the question did not violate defendant's rights under the Fifth Amendment. *See Smith*, 310 Or at 8 (holding that under the Fifth Amendment, *Miranda* warnings must be given when a person is in custody, *i.e.*, when a person's freedom has been significantly restrained).

[3] ORS 813.136 provides that if a person refuses to submit to field sobriety tests as required by ORS 813.135, evidence of the *refusal* to take the tests is admissible in any proceeding arising from allegations that the person was driving while intoxicated.

used against defendant in court. The officer then asked several questions * * *. The reference to 'questions' in the warning was not open-ended: It applied to 'these' questions, *i.e.*, those immediately following and connected with the field sobriety tests."

Thus, the state concludes that there was a "clear break" from the first statement made by Wyatt and, therefore, the earlier statement's effect did not taint the post-arrest interview.

In *State v. Scott*, 111 Or App 308, 826 P2d 71 (1992), we held that certain statements that the defendant made during field sobriety tests were inadmissible because the defendant had not been sufficiently advised of his *Miranda* rights beforehand. In that case, the defendant was arrested and advised of his *Miranda* rights at the scene of the arrest. Upon arriving at the jail, the officer advised him that he would be asked to perform field sobriety tests, and that evidence of a refusal to perform could be offered against him in a criminal or civil action. The defendant consented to do the tests and, during the course of the tests, the officer asked the defendant to rate his level of intoxication. We held that such a question was intended to elicit testimonial evidence. Although the officer initially had advised the defendant of his right against self-incrimination, he had told the defendant later that the refusal to submit to the tests could be used against him. We concluded that the defendant could have believed that refusing to rate his level of intoxication would also constitute a refusal to submit to field sobriety tests, and therefore, his answer to the question should have been suppressed because of the absence of an effective *Miranda* warning. Relying on our holding in *Scott*, we held in *State v. Lawrence*, 117 Or App 99, 843 P2d 488 (1992), *aff'd* 320 Or 107 (1994), that there must be "some type of 'clear break' " to distinguish questions that are part of field sobriety tests from subsequent investigatory questions, "so that motorists do not believe that they are *required* to respond to the latter." *Id.* at 103 (emphasis in original).

■ In this case, Wyatt left defendant for almost 15 minutes after defendant completed the field sobriety tests, then returned, placed him under arrest and administered a

*Miranda* warning. We conclude that, under those circumstances, there was a "clear break" between Wyatt's earlier statements and his later post-arrest questioning. Defendant's answers to those questions were not therefore involuntary and the admission of those answers did not violate his rights under Article I, section 12.[4]

Defendant next assigns error to the trial court's failure to suppress the evidence of defendant's performance of the field sobriety tests. He argues that, under the Oregon Supreme Court's holding in *State v. Fish*, 321 Or 48, 893 P2d 1023 (1995), the trial court should have suppressed the evidence because the tests were all "testimonial" in nature. The state argues that *Fish* does not require reversal in this case, because two of the tests at issue—the walk-and-turn and the one-leg-stand tests—did not elicit testimony from defendant; instead, they revealed defendant's physical or physiological condition, which does not implicate the constitutional prohibition against requiring individuals to "testify" against themselves. As for the third test—the "modified" Romberg—the state concedes that at least a portion of the test, which requires recitation of the alphabet, involves testimony. Nevertheless, because defendant *correctly* recited the alphabet, the state argues that evidence as to the results of that test was harmless. Defendant counters that the results of all three field sobriety tests were testimonial in nature, because all revealed his intoxicated "state of mind," which the Supreme Court in *Fish* decided was the defining characteristic of "testimony" within the meaning of Article I, section 12.

■ We agree with the state for two reasons. First, the *Fish* decision did not explicitly require all field sobriety tests to be considered testimonial within the meaning of Article I, section 12. In fact, reading the decision in contrary fashion would require us to assume that the Supreme Court overruled, without acknowledging that it was doing so, a large body of prior case law holding that physical evidence of intoxication is not testimonial in nature. Second, in subsequent case law, the Supreme Court itself has disclaimed, albeit in

---

[4] We also conclude that the *Miranda* warning was sufficient under the Fifth Amendment.

*dictum*, the notion that its decision in *Fish* requires all field sobriety tests to be considered testimonial.

In *Fish*, a sharply divided court held that evidence of the defendant's refusal to perform certain field sobriety tests could not be admitted against him. The court reasoned that, because evidence of the refusal was "testimony," and because the results of the field sobriety tests also would have been "testimonial," the defendant thus was placed in a dilemma that did not allow him to exercise his constitutional right against compelled self-incrimination. The limited nature of the court's holding bears careful scrutiny.

The court began by addressing whether evidence of the refusal was "testimony" within the meaning of Article I, section 12:

> "Under Article I, section 12, of the Oregon Constitution, individuals may not be compelled to disclose their beliefs, knowledge, or state of mind to be used in a criminal prosecution against them. In offering an individual's refusal to perform field sobriety tests into evidence, the state wants the jury to infer from the fact of an individual's refusal that he or she is saying, 'I refuse to perform field sobriety tests because I believe I will fail them.' "

*Fish*, 321 Or at 56. Evidence of the refusal is testimony not because it offers a basis for drawing an inference about whether an individual is intoxicated, but because it offers a basis for drawing an inference about an individual's *belief* as to his or her intoxicated state. The court emphasized that when it noted:

> "[T]he fact that a person refused or failed to perform field sobriety tests inferentially may communicate the person's belief—that the person refused to perform the tests because he or she believed that the performance of the tests would be incriminating. For an individual to reveal his or her thoughts is necessarily to make a communication, whether by words or actions. Evidence of an individual's refusal therefore communicates his or her state of mind."

*Id.* Thus, the court explicitly equated the individual's "state of mind" with his or her "thoughts" or "beliefs," not merely anything that inferentially may reveal the working order of the individual's mental faculties.

The court then concluded that certain field sobriety tests also are "testimony" under Article I, section 12. The court examined four tests—counting, answering questions concerning address and date of birth, estimating a period of time and reciting the alphabet—and concluded that those tests are testimonial. In reaching that conclusion, the court again referred to an individual's "state of mind." This time, however, the court used slightly different wording. It said that the four tests "draw upon the individual's memory, perception, and ability to communicate, *i.e.*, his or her testimonial capacity." *Id.* at 60. Beyond that, the court offered no explanation for its conclusion. It did, however, very carefully and explicitly explain that it was not holding that any other tests also were testimonial:

> "[W]e express no opinion regarding whether aspects of the field sobriety tests other than those we expressly address are 'testimonial' or 'non-testimonial.'"

*Id.* at 59 n 6.

Defendant reads the *Fish* decision to mean that all field sobriety tests are "testimonial" in nature, because they reveal his "beliefs, knowledge or state of mind." Apparently, defendant rests his conclusion on the assumption that anything that reveals a state of intoxication reveals one's "state of mind," as that term is used in *Fish*. The Supreme Court, however, did not say that in its *Fish* opinion. To the contrary, in at least one instance, the court equated "state of mind" with "thoughts" and "beliefs," not everything that evidences a state of intoxication. That comes as no surprise, as there exists a long line of cases declaring that tests that produce physical evidence of a state of intoxication are not testimonial. *See, e.g., Schmerber v. California*, 384 US 757, 765, 86 S Ct 1826, 16 L Ed 2d 908 (1966) (blood test evidence is "neither petitioner's testimony nor evidence relating to some communicative act"); *Heer v. Dept. of Motor Vehicles*, 252 Or 455, 462, 450 P2d 533 (1969) (a breathalyzer is "'unrelated to a communication by the subject'"; *quoting State v. Kenderski*, 99 NJ Super 224, 229, 239 A2d 249 (1968));[5] *State v. Herndon*, 116 Or App 457, 462, 841 P2d 667 (1992) ("The privilege

---

[5] The current formulation of the federal test was stated in *Pennsylvania v. Muniz*, 496 US 582, 110 S Ct 2638, 110 L Ed 2d 528 (1990), in which the court

against self-incrimination is not implicated by the requirement that a defendant submit to a breath test. The results are not testimonial * * *."). Thus, if defendant is correct, we must conclude that the Supreme Court intended in *Fish* to overrule those cases without ever saying that it intended to do so, indeed, in the face of explicit language in the opinion emphasizing the limited nature of its holding. Under the circumstances, we are disinclined to read that much into the court's opinion.

That the court did not intend its decision in *Fish* to reach as far as defendant contends in this case is further borne out by a subsequent opinion of the court. In *State v. Prickett*, 324 Or 489, 930 P2d 221 (1997), the court addressed whether questioning that occurs after the completion of lawful field sobriety tests is compelling within the meaning of Article I, section 12, thereby triggering the requirement that a defendant first be advised of his or her rights to remain silent and to obtain counsel. The court held that completing a field sobriety test, without more, does not create a compelling setting that requires advice of constitutional rights as a predicate to further questioning. The court commented, on its own initiative, that its decision was entirely consistent with its earlier decision in *Fish*, because the defendant voluntarily had taken the field sobriety tests and did not challenge the admissibility of the evidence of the results. In addition, the court commented:

> "*Fish* did not hold that *every* field sobriety test compels testimonial evidence as a matter of law. Moreover, nothing in *Fish* suggests that the completion of a proper field sobriety test necessarily creates a 'compelling' setting * * *."

*Prickett*, 324 Or at 497 (emphasis in original).

---

reiterated its holding in *Schmerber* that there is a distinction between physical and testimonial evidence of intoxication, commenting:

> "[T]he privilege [against self-incrimination] 'protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature.' [*Schmerber*, 384 US] at 761, 16 L Ed 2d 908, 86 S Ct 1826. '[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a "witness" against himself.' *Doe v. United States*, 487 US 201, 210, 101 L Ed 2d 184, 108 S Ct 2341 (1988)."

*Id.* at 589.

We must acknowledge that there is language in *Fish* that fairly supports defendant's contentions in this case. The court did, at one point, make reference to "state of mind" in terms of "testimonial capacity," and "testimonial capacity" reasonably could refer to an individual's state of intoxication. Nevertheless, because of the limited nature of the court's actual holding, because adopting defendant's position would require us to reach the unlikely conclusion that the court intended silently to overrule so large a body of contrary case law and because the court later expressly disclaimed any such intention, we decline to read the decision as defendant suggests.

From the limited nature of the holding in *Fish*, therefore, coupled with the still-valid case law regarding physical evidence, we reach the following conclusions as to what is and is not testimonial within the meaning of Article I, section 12, of the Oregon Constitution. First, from *Fish*, we understand that "testimony" is the communication by words or conduct of an individual's thoughts, beliefs or "state of mind." Thus, purely verbal answers to purely verbal questions ("On an intoxication scale of 1 to 10, I think I rank a 2.") are testimony, as are answers by conduct to the same question (holding up two fingers to self-rank intoxication on a 1 to 10 scale). From the physical evidence cases, we also understand that, as a general rule, tests that produce physical evidence of an individual's intoxication are not testimonial. Thus, a test that reveals an individual's intoxicated state, without requiring the individual to reveal his or her thoughts, beliefs or "state of mind," is not testimonial.

With the foregoing in mind, we turn to the three field sobriety tests at issue in this case. Each of the three tests—the walk-and-turn, the one-leg-stand and the "modified" Romberg—are known as "divided attention tests," requiring the subject to perform two or more activities at the same time. The purpose of the tests is to determine the extent to which the subject can perform various *combinations* of tasks at once. Because of the physiological effects of alcohol on the body's nerve cells, neurotransmitters and vestibular apparati, *see generally* Donald H. Nichols, *Drinking/Driving Litigation* § 26.04 (1985 & Cumm Supp 1996) (describing physiological effects of alcohol on the human body), individuals who are intoxicated tend to be unable to accomplish such

"multi-tasking," even when they can handle individual tasks adequately. *See generally* National Highway Traffic Safety Administration, *DWI Detection and Standardized Field Sobriety Testing* at VII-2 (1995) ("Even when they are under the influence, many people can handle a single, focused attention task fairly well. * * * However, most people when under the influence cannot satisfactorily divide their attention to handle multiple tasks at once."). To detect impairment effectively, persons conducting the tests must ask suspects to engage in an activity that keeps their minds occupied, such as counting or reciting the alphabet, while at the same time performing a simple physical task such as walking. The purpose of the test is not, it bears emphasis, to obtain answers to the questions put to the subject; it is instead to determine whether the person can perform the physical tasks as requested while at the same time attempting to answer the questions.

■ It is at this juncture that we part company with the dissent, which, as we understand it, regards the purpose of the divided attention tests as examining a subject's "mental functions." The test protocols themselves, however, show that the dissent's reasoning is incorrect. Each examines the extent to which the subject can perform *physical* tasks while distracted with a verbal task. Whether the subject correctly performs the verbal task is irrelevant, as is any other information about the subject's thoughts, beliefs or state of mind. The dissent insists that field sobriety tests can reveal more than that, namely, whether the subject "was able to perceive the directions, remember them and translate them into the requested actions." 147 Or App at 312. That may be. The same is true, however, with respect to all police inquiries, including tests such as the Horizontal Gaze Nystagmus test, which even the dissent acknowledges does not offend the constitutional prohibition against compelled testimony. In any event, the fact that a given test *may* elicit testimonial evidence does not mean that the test cannot be given or that *all* of the results are inadmissible. With that in mind, we examine each of the three tests at issue in this case, describing first the general protocol and then the particular evidence that each produced.

■ The first of the three tests at issue is the walk-and-turn test. The individual conducting the test generally

requests that the subject stand in a line in heel-to-toe position and listen to instructions. The subject is told to take a certain number of steps down the line and then is instructed to turn in a prescribed manner. The subject's condition is evaluated in terms of a number of performance criteria: inability to balance, starting too soon, stopping prematurely, failing to touch heel-to-toe, stepping off the line, using arms to balance, losing balance on turns or turning incorrectly and taking the wrong number of steps. The person conducting the test looks for the subject to exhibit two or more of the foregoing physical performance criteria, not for information as to the subject's thoughts, beliefs or state of mind. *See generally DWI Detection* at VII-3.

In this case, defendant was asked to place his feet heel-to-toe and walk. He could not, however, keep his balance standing in that position. Because the test revealed only defendant's inability to perform the physical tasks requested of him, it was not error to allow evidence of the results.

The second test is the one-leg-stand test. The subject generally is asked to stand with feet together, keeping arms at side while listening to instructions. The subject then is asked to raise one leg approximately six inches off the ground, toes pointing out, while counting until told to stop. Four specific physical performance criteria are examined: swaying while balancing, using arms to balance, hopping and putting the elevated foot down. The person conducting the test looks for two or more of the physical performance criteria. *DWI Detection* at VII-4 to VII-5. The subject's thoughts, beliefs or state of mind are irrelevant.

In this case, defendant was asked to stand on one foot with his hands at his side while counting from 1 to 30 by thousands. He continually held out his arms to balance himself and swayed while standing on one leg. The counting itself arguably is testimonial under *Fish*. Defendant, however, did not argue to the trial court that admitting evidence as to his counting—as a component of the one-leg-stand test—was compelled self-incrimination, and so we do not address that issue. Thus, as relevant to this appeal, the test involved only the determination of defendant's intoxication through his

inability to maintain his balance, and the trial court did not err in admitting the results.

▆▆ The final test at issue is the "modified" Romberg test, which, as does the one-leg-stand test, involves the combination of verbal and physical tasks. The subject is asked to stand with heels together, arms at side and eyes closed. The subject then is asked to tilt his or her head back while responding to questions. Again, as in the case of the one-leg-stand test, the object of the test is not to elicit information from the subject as to his or her thoughts, beliefs or state of mind, rather, it is to determine the extent to which the subject can remain physically balanced while performing a verbal task.

In this case, defendant was directed to stand, heels together, arms at side, eyes closed, and then to tilt his head backward while reciting the alphabet. Defendant swayed back and forth and slurred his speech as he correctly recited the alphabet. To be sure, under *Fish*, reciting the alphabet arguably is testimonial under Article I, section 12. In this case, however, defendant recited the alphabet *correctly*, and any error in admitting evidence as to that fact was therefore harmless. The remainder of the test produced only physical evidence of defendant's condition, and it was not error to admit that evidence.

Defendant's remaining arguments do not require discussion.

Affirmed.

**EDMONDS, J.,** dissenting.

The majority rejects defendant's argument that all of the field sobriety tests that he was required to perform were "testimonial" under the Supreme Court's holding in *State v. Fish*, 321 Or 48, 893 P2d 1023 (1995), and, therefore, that the trial court erred when it refused to suppress the evidence of the results of the tests as well as the derivative evidence of the Intoxilyzer and the blood test results. I believe that the reasoning in *Fish* clearly requires us to accept defendant's argument as to the tests in question.

The majority and I agree that *Fish* did not hold expressly that all field sobriety tests are "testimonial" in nature.[1] Rather, it focused on tests involving counting, answering questions relating to residence, date of birth, estimating a period of time and reciting the alphabet. In this case, the tests that the state required defendant to perform included the "walk-and-turn" test, the "standing on one leg" test, and the "Romberg Balance Test." As will become apparent, each test involves "testimonial" aspects as defined by *Fish*.

It is important to recognize that *Fish* was decided under Article I, section 12, of the Oregon Constitution and not under the Fifth Amendment. That understanding is important because the court expands the concept of what would be "testimonial evidence" under the federal constitution. The court holds that " 'testimonial' evidence is not limited to verbal statements of fact or belief" under section 12. 321 Or at 59. "Rather, as explained * * * in connection with evidence of [the] refusal [to submit to field sobriety tests], 'testimonial' evidence includes *any evidence of conduct* communicating the individual's state of mind." *Id.* (Emphasis supplied.) Thus, according to *Fish*, the refusal to perform field sobriety tests is protected under section 12 because

"the state wants the jury to infer from the fact of an individual's refusal that he or she is saying, 'I refuse to perform field sobriety tests because I believe I will fail them.' Thus, the fact that a person refused or failed to perform field sobriety tests inferentially may communicate that person's belief—that the person refused to perform the tests because he or she believed that the performance of the tests would be incriminating. For an individual to reveal his or her *thoughts* is necessarily to make a communication, whether by words or actions." 321 Or at 56. (Emphasis supplied.)

---

[1] The court explained:

"Whether field sobriety tests are testimonial presents a difficult issue concerning the boundary between 'testimonial' and 'non-testimonial' evidence. * * * Because we need only decide if *any* portion of the field sobriety tests approved in OAR 257-25-020(1) involves 'testimonial' evidence, we need not delineate the precise contours of 'testimonial' evidence under Article I, section 12. Accordingly, we express no opinion regarding whether aspects of the field sobriety tests other than those we expressly address are 'testimonial' or 'non-testimonial.' " 321 Or at 59 n 6. (Emphasis in original.)

The test, then, under section 12 as to whether evidence is "testimonial" is whether it communicates information about the thoughts, beliefs, knowledge or state of mind of the actor. The court in *Fish* explains:

> "Some of the field sobriety tests involve verbal statements that communicate information regarding an individual's state of mind. Many of the field sobriety tests authorized by OAR 257-25-020(1) draw upon the individual's *memory, perception and ability to communicate, i.e.*, his or her testimonial capacity. For example, the tests involve counting, OAR 257-25-020(1)(b), (1)(f), (1)(h); answering questions relating to the individual's residence and date of birth, OAR 257-25-020(1)(d)(B); estimating a period of time, OAR 257-25-020(1)(i); and reciting the alphabet, OAR 257-25-020(1)(g). There can be no doubt that those aspects of the field sobriety tests require the individual to communicate information to the police about the individual's *beliefs, knowledge, or state of mind*. Accordingly, we conclude that at least those aspects of the field sobriety test are clearly 'testimonial' under Article I, section 12, of the Oregon Constitution." 321 Or at 60. (Emphasis supplied.)

Thus, all evidence that communicates information about a state of mind constitutes "testimonial" evidence under section 12, including evidence of acts from which perception, uncommunicated physical sensations, comprehension and the processing of information so as to comply with directions could be inferred. For example, the counting test held to be "testimonial" in *Fish* can require the subject to count backwards. The mere recital of numbers by the subject reveals no incriminating information. Rather, the officer administers the test because he wishes to explore the subject's mental faculty (his state of mind) to count in an unusual manner that requires mental gymnastics. Similarly, asking questions about residence, date of birth, lapse of time and the alphabet tests the subject's ability to recall and recollect and his orientation to time and place. All of these tests require that the subject disclose some part of his or her thought life and, by inference, any impairment of mental processes.

In summary, it is apparent from the court's discussion in *Fish* that it considers "state of mind" to encompass more than the verbal expression of incriminating thoughts or

beliefs under section 12. Rather, "state of mind," as defined, includes those inferences about memory, perception, cognitive processes and the ability to communicate that can be drawn from *compelled* conduct. Under the court's holding,[2] the protection of section 12 against self-incrimination is extended to any mental function that a subject would not wish to reveal while under the scrutiny of an officer investigating a driving while under the influence offense.

In this case, each test that defendant performed at the officer's direction revealed something about his state of mind. As the majority concedes, the officer gave defendant multiple instructions[3] regarding the walk-and-turn test, in part to test his ability to follow directions. Whether he followed those directions revealed something about his state of mind, *i.e.*, whether he was able to perceive the directions, remember them and translate them into the requested actions. The instructions for the one-leg test and the "Romberg Balance Test" make the same inquiries. Thus, more than the mere performance of a physical exercise is at stake. The tests probed defendant's mental faculties as well. In that sense, the walk-and-turn test, the one-leg stand test and the "Romberg Balance Test" are no different from the tests like counting backwards that require cognitive responses, and that the court found subject to section 12 in *Fish*.

Ultimately, at the heart of the issue is whether section 12 permits the state to compel its citizens to reveal the impairment of mental faculties that arises from the interaction of alcohol with the brain and the central nervous system.

---

[2] The majority asserts a second reason for rejecting defendant's argument. It says that the Supreme Court "has disclaimed, albeit in *dictum*, the notion that its decision in *Fish* requires all field sobriety tests to be considered testimonial." 147 Or App at 302-03. The *dictum* in *State v. Prickett*, 324 Or 489, 930 P2d 221 (1997), on which it relies, merely states the obvious. The court in *Fish* did not undertake to decide whether every field sobriety test compels testimonial evidence, nor is that the import of my position. It is apparent that some tests, like the Horizontal Gaze Nystagmus test, measure solely physical reactions, and, therefore, could be considered to compel the production of physical evidence only.

[3] Each test required defendant to perform multiple physical and mental functions at the same time. For instance, defendant was requested to keep his hands at his side, stand on one leg, raise the other six inches off the ground, look at his toe and count from 1 to 30 by thousands. Then, he was asked to stand with his feet together, toes touching, heels side-by-side, hands down to his sides, eyes closed, head tipped back and to recite the alphabet.

The majority is correct that tests that compel production of physical evidence such as blood, fingerprints or handwriting exemplars do not implicate section 12. Similarly, to the extent that the administration of field sobriety tests manifest an impaired physical state, section 12 is not implicated. However, as I have pointed out, the field sobriety tests administered in this case produced more than physical evidence or observations of physical behavior. They told the officer how defendant perceived what was going on around him and whether he was able to follow specific directions both mentally and physically. In essence, they required him to disclose what was in his mind.

Under ORS 813.010(1)(b), a person is guilty of driving while under the influence when the person's physical *or mental* faculties are adversely affected to a noticeable or perceptible degree. *State v. O'Key*, 321 Or 285, n 31, 899 P2d 663 (1995). Impairment due to alcohol consumption is not always physically apparent. Field sobriety tests, like the ones that the state compelled defendant to perform, also could compel disclosure of evidence of an incriminating impairment to mental faculties that may not otherwise be perceptible or noticeable. Because the court has defined "testimonial evidence" as any evidence communicating an individual's state of mind, it necessarily follows that section 12 is implicated when an individual is compelled to disclose against his will how his mental processes operate. As construed, section 12 guarantees not only that our verbal expressions cannot be used against us, but also that which we perceive, sense, believe and know in our minds and do not wish to communicate. Defendant's argument under *Fish* is correct, and, therefore, his conviction should be reversed.

For these reasons, I dissent.[4]

Warren, J., joins in this dissent.

---

[4] I feel as strongly about the enforcement of our driving while under the influence laws as the next person. We lose too many productive citizens because of drinking and driving, and the efforts to limit the carnage on our highways have a worthy objective. Nonetheless, the fervor to save lives needs to be tempered by the understanding that the constitutional prohibition against self-incrimination is at the core of our liberty, and that, when implicated, there is more at stake than the interests of the public in getting drunk drivers off the road. Because the Supreme Court has given effect to a constitutional provision in this context, the right against self-incrimination necessarily transcends what otherwise would be a justifiable end.